## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| COMPANIA VALENCIANA DE ALUMINIO BAUX, S.L.U. and BANCOLOR BAUX, S.L.U., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) ) Ct. No. 23-00259 |
| Defendant, | ) ) |
| and | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP | ) ) ) |
| Defendant-Intervenor. | ) ) |

## ORDER

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of Plaintiffs Compañia Valenciana de Aluminio Baux, S.L.U. and Bancolor Baux S.L.U., and all other pleadings, papers and proceedings herein, it is hereby

**ORDERED**, that the Rule 56.2 Motion is GRANTED, and it is further

**ORDERED**, that the final results of the first administrative review of the antidumping duty order on common alloy aluminum sheet from Spain is remanded to the U.S. Department of Commerce ("Commerce") with instructions to revise its analysis and final results in accordance with the Court's Opinion; and it is further

**ORDERED**, that Commerce shall provide the Court and parties with revised finding within 60 days of this order. Parties shall have 30 days to submit briefs on the revised results to the Court. Responses to those briefs shall be filed within 15 days.

Dated: _____                     _____
        New York, New York                              Timothy M. Reif, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| COMPANIA VALENCIANA DE ALUMINIO BAUX, S.L.U. and BANCOLOR BAUX, S.L.U., )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP )<br><br>Defendant-Intervenor. ) | Ct. No. 23-00259 |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFFS COMPAÑIA VALENCIANA DE ALUMINIO BAUX, S.L.U. AND BANCOLOR BAUX S.L.U.**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs Compañia Valenciana de Aluminio Baux, S.L.U. ("Baux") and Bancolor Baux S.L.U. ("Bancolor") hereby move for judgment on the agency record. Plaintiffs contest certain aspects of the final results of the first administrative review of the antidumping duty ("AD") order on common alloy aluminum sheet ("CAAS") from Spain conducted by the U.S. Department of Commerce ("Commerce"). See Common Alloy Aluminum Sheet From Spain: Final Results of Antidumping Duty Administrative Review; 2020-2022, 88 Fed. Reg. 76,722 (Dep't of Commerce Nov. 7, 2023) ("Final Results") (P.R. 140).

Specifically, as discussed in the Memorandum of Points and Authorities in support of this motion, the Plaintiffs seek judgment on the agency record because Commerce's Final Results were

not supported by substantial evidence and were otherwise not in accordance with law for two reasons.

First, Commerce's test for determining the existence of a different level of trade ("LOT") under 19 C.F.R. § 351.412(c)(2) is not in accordance with law.  In determining whether a difference in LOTs exists, Commerce inserted a level of intensity requirement, i.e., that a "substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing."  19 C.F.R. § 351.412(c)(2) (emphasis added).  Commerce's interpretation of its regulation is unreasonable under Chevron Step 2.  Commerce's intensity requirement conflicts with its statutory mandate that Commerce "shall" make a LOT adjustment based on the "performance of different selling activities."  19 U.S.C. § 1677b(a)(7)(A)(i) (emphasis added).  In other words, a LOT adjustment is mandated when there is any difference in selling functions.  Further, Commerce's intensity requirement unlawfully tightens a test that Congress designed to ensure a fair comparison between normal value and export price or constructed export price.

Second, beyond this threshold legal issue, Commerce's underlying factual determination that Baux's home market consisted of one LOT was not supported by substantial evidence and was otherwise not in accordance with law.  Commerce either failed to provide a reasonable explanation for treating this case differently than past determinations where Commerce found nearly identical facts sufficient to establish a difference in LOTs or outright ignored evidence that detracted from its preferred conclusion that only one LOT existed in the home market. The only reasonable reading of the record is that three distinct LOTs existed in Baux's home market given that: 1) different channels of distribution existed in the home market whereby Bancolor and its standalone distribution center in Madrid ("Madrid DC") served as resellers of Baux's CAAS, 2) Bancolor and

Madrid DC performed different selling functions in the home market and 3) where Baux and its affiliates performed the same selling functions in all three LOTs in the home market, they did so a differing intensity levels.

Plaintiffs, therefore, respectfully request that this Court:

(1) find that Commerce's actions as described above were not supported by substantial evidence or were otherwise not in accordance with law;

(2) order Commerce to recalculate the antidumping duty margin assigned to Baux in the administrative review by correcting the errors set forth above;

(3) order Commerce to publish amended Final Results in the Federal Register in accordance with a final decision by this Court in this matter;

(4) order Commerce to issue liquidation instructions to U.S. Customs and Border Protection consistent with this Court's decision; and

(5) provide such other relief as this honorable Court deems proper.

Respectfully submitted,

Dated:   June 11, 2024

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Bryan P. Cenko
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
202-688-3610 (ph)
202-595-8968 (fax)
trade@mowrygrimson.com
*Counsel to Compañia Valenciana de Aluminio Baux, S.L.U. and Bancolor Baux S.L.U.*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| COMPANIA VALENCIANA DE ALUMINIO BAUX, S.L.U. and BANCOLOR BAUX, S.L.U., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP <br><br> Defendant-Intervenor. | Ct. No. 23-00259 <br> Nonconfidential Version |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFFS COMPAÑIA VALENCIANA DE ALUMINIO BAUX, S.L.U. AND BANCOLOR BAUX S.L.U.**

Jeffrey S. Grimson
Kristin H. Mowry
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

June 11, 2024

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES........................................................................................................... ii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ........................................................ 1

ISSUES PRESENTED ................................................................................................................. 1

    I.    Whether Commerce's decision to include a degree of intensity in its level of trade analysis as promulgated under 19 C.F.R. § 351.412(c)(2) is in accordance with law? .............. 1

    II.    Whether Commerce's finding that Baux failed to establish the existence of three different levels of trade in the home market and Commerce's failure to make a corresponding adjustment for Baux was supported by substantial evidence and was otherwise in accordance with law?................................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 1

SUMMARY OF THE ARGUMENT ..............................................................................................11

STANDARD OF REVIEW ......................................................................................................... 12

ARGUMENT ........................................................................................................................... 13

    I.    COMMERCE'S REGULATORY TEST FOR DETERMINING DIFFERENCES IN LOTs CONFLICTS WITH ITS STATUTORY MANDATE TO CALCULATE A FAIR COMPARISON PRICE ........................... 13

        A.    Commerce's Regulatory Test Unlawfully Limits the Adjustment Mandated by the Statute ............................................................................................................................... 14

        B.    Commerce's Interpretation Fails Under Chevron Step 2 ................................................ 16

    II.    COMMERCE'S DETERMINATION OF ONE LOT WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS OTHERWISE NOT IN ACCORDANCE WITH LAW........................................ 21

        A.    Substantial Evidence Established Different Channels of Distribution in the Home Market .............................................................................................................................. 22

        B.    Substantial Evidence Established that Baux Performed Different Selling Functions, as Opposed to Mere Selling Activities, in One LOT But Not Others in the Home Market...... 25

        C.    Substantial Evidence Established Selling Functions that Differ by Degree of Intensity in Baux's Home Market ................................................................................................... 39

CONCLUSION........................................................................................................................ 45

TABLE OF AUTHORITIES

**Cases**

Alloy Piping Prods. v. United States,
    33 CIT 349 (2009) ................................................................................................ 40

Aqua Prods., Inc. v. Matal,
    872 F.3d 1290 (Fed. Cir. 2017) ............................................................................ 13

Arista Networks, Inc. v. Cisco Sys., Inc.,
    908 F.3d 792 (Fed. Cir. 2018) .............................................................................. 18

Bennett v. Spear,
    520 U.S. 154 (1997) .............................................................................................. 18

Canadian Solar, Inc. v. United States,
    918 F.3d 909 (Fed. Cir. 2019) .............................................................................. 12

Changzhou Trina Solar Energy Co. v. United States,
    975 F.3d 1318 (Fed. Cir. 2020) .............................................................. 12, 27, 37, 38

Chapman v. Houston Welfare Rights Org.,
    441 U.S. 600 (1979) .............................................................................................. 20

Chevron U.S.A., Inc. v. NRDC,
    467 U.S. 837 (1984) .............................................................................................. 13

Consol. Edison Co. v. NLRB,
    305 U.S. 197 (1938) .............................................................................................. 12

Holloway v. United States,
    526 U.S. 1 (1999) .................................................................................................. 18

Huayin Foreign Trade Corp. v. United States,
    322 F.3d 1369 (Fed. Cir. 2003) .............................................................. 12, 23, 33

King v. Burwell,
    576 U.S. 473 (2015) .............................................................................................. 18

Micron Technology, Inc. v. United States,
    243 F.3d 1301 (Fed. Cir. 2001) ............................................................ 14, 15, 20, 21

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ............................................................................................ 12, 13

NMB Sing. Ltd. v. United States,
    557 F.3d 1316 (Fed. Cir. 2009) ..................................................................... 12, 33, 42

Pasta Zara Spa v. United States,
    34 CIT 355 (2010) ........................................................................................ 25, 26, 27

Pasta Zara SpA v. United States,
    35 CIT 620 (2011) .............................................................................................. 26, 27

RHP Bearings v. United States,
    288 F.3d 1334 (Fed. Cir. 2002) ............................................................. 13, 22, 25, 27

SNR Roulements v. United States,
    402 F.3d 1358 (Fed. Cir. 2005) .................................................................................. 14

SolarWorld Ams., Inc. v. United States,
    910 F.3d 1216 (Fed. Cir. 2018) .................................................................................. 12

SolarWorld Ams., Inc. v. United States,
    910 F.3d 1216 (Fed. Cir. 2018) .................................................................................. 12

Torrington Co. v. United States,
    68 F.3d 1347 (Fed. Cir. 1995) .................................................................................... 21

United States v. Haggar Apparel Co.,
    526 U.S. 380 (1999) ................................................................................................... 13

Universal Tube & Plastic Indus. v. United States,
    __ CIT __, 586 F. Supp. 3d 1312 (2022) ...................................................... 21, 41, 42

**Statutes**

19 U.S.C. § 1677a ............................................................................................................ 14

19 U.S.C. § 1677b..................................................................................................... passim

19 U.S.C. § 1673 ............................................................................................................ 14

19 U.S.C. § 1677............................................................................................................. 14

**Other Authorities**

Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27,296 (Dep't Commerce
    June 18, 1997)........................................................................................................... 19

Certain Cold-Rolled Steel Flat Products Final Determination of Sales at Less Than Fair Value,
    81 Fed. Reg. 49,929 (July 20, 2016)........................................................................ 22

Certain Fabricated Structural Steel from Mexico, 85 Fed. Reg. 5,390 (Dep't of Commerce Jan
    30, 2020) ................................................................................................................... 22

Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of
    Antidumping Duty Administrative Review; 2017- 2018, 85 Fed. Reg. 77,159 (Dec. 1, 2020) 41

Common Alloy Aluminum Sheet From Spain: Final Results of Antidumping Duty Administrative
    Review; 2020-2022, 88 Fed. Reg. 76,722 (Dep't of Commerce Nov. 7, 2023) ........................ 1

Emulsion Styrene-Butadiene Rubber from Brazil:  Final Results of Antidumping Duty
    Administrative Review; 2017-2018, 85 Fed. Reg. 38,847 (Jun. 29, 2020) .............................. 25

Stainless Steel Bar from Brazil: Preliminary Results of Antidumping Duty Administrative
    Review: 2013-2014, 79 Fed. Reg. 75,789 (December 15, 2014) ............................................. 23

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316
    (1994)........................................................................................................................ 20

**Regulations**

19 C.F.R. § 351.412 ................................................................................................ passim

### ADMINISTRATIVE DETERMINATION UNDER REVIEW

Plaintiffs Compañia Valenciana de Aluminio Baux, S.L.U. ("Baux") and Bancolor Baux S.L.U. ("Bancolor") challenge certain aspects of the final results of the first administrative review of the antidumping duty ("AD") order on common alloy aluminum sheet ("CAAS") from Spain conducted by the U.S. Department of Commerce ("Commerce").  See Common Alloy Aluminum Sheet From Spain: Final Results of Antidumping Duty Administrative Review; 2020-2022, 88 Fed. Reg. 76,722 (Dep't of Commerce Nov. 7, 2023) ("Final Results") (P.R. 140), and accompanying Issues and Dec. Mem. ("Final I&D Mem.") (P.R. 134).

### ISSUES PRESENTED

I.   **Whether Commerce's decision to include a degree of intensity in its level of trade analysis as promulgated under 19 C.F.R. § 351.412(c)(2) is in accordance with law?**

II.  **Whether Commerce's finding that Baux failed to establish the existence of three different levels of trade in the home market and Commerce's failure to make a corresponding adjustment for Baux was supported by substantial evidence and was otherwise in accordance with law?**

### STATEMENT OF FACTS

On June 9, 2022, Commerce initiated the first administrative review covering one entry of CAAS during the period from October 15, 2020 through March 31, 2022.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 35,165 (Dep't of Commerce June 9, 2022) (P.R. 8).  Between July 29, 2022 and April 12, 2023, Baux timely submitted answers to Commerce's AD questionnaire and supplemental questionnaires.  See Common Alloy Aluminum Sheet From Spain: Preliminary Results of Antidumping Duty Administrative Review; 2020-2022, 88 Fed. Reg. 29,090 (Dep't of Commerce May 5, 2023) ("Prelim. Results") (P.R. 103), and accompanying Dec. Mem. at 2 ("Prelim. Dec. Mem.") (P.R. 97).  To determine the dumping margin, Commerce calculates normal value ("NV") based on

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

home market sales at the same level of trade ("LOT") as the U.S. sales.  <u>See</u> Prelim. Dec. Mem. at 8 (P.R. 97).  Sales are made at different LOTs if they are made at different marketing stages.  <u>See</u> 19 U.S.C § 1677b(a)(7)(A)(i).  "Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing."  19 C.F.R. § 351.412(c)(2).  In determining whether differences in LOT exists, Commerce considers both quantitative and qualitative evidence.  <u>See</u> Prelim. Dec. Mem.  at 9 (P.R. 97).  Commerce "shall" make due allowance where the U.S. sales are made at different LOTs from home market sales.  19 U.S.C § 1677b(a)(7)(A).

Baux reported six channels of distribution in its response to Commerce's AD Section A questionnaire:

[



]. <u>See</u> Letter on Behalf of Baux to Dep't of Commerce re: Sec. A Resp. at A-16 (July 29, 2022) ("Sec. A Resp.") (C.R. 5-12). Bancolor is Baux's affiliate and is the largest customer of Baux's uncoated coils. <u>See</u> Letter on Behalf of Baux to Dep't of Commerce re: Case Brief at 22 (Aug. 15, 2023) ("Case Brief") (P.R. 120-122). Bancolor has an extensive coil painting and processing operations located in Elche de la Sierra, Spain and in addition, it has a standalone distribution center in Madrid (i.e., "Madrid DC" shown in the table above). <u>See</u> <u>id.</u> at 22-23; <u>see also</u> Letter on Behalf of Baux to Dep't of Commerce re: Section B-C Response at B-5 (Aug. 22, 2022) ("Secs. B-C Resp.") (P.R. 40-44).

In its response to Commerce's AD Section B questionnaire, Baux explained that these channels of distribution fall into three distinct LOTs in the home market, as reported in the home market sales database in the field "LOTH":

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

[



]. <u>See</u> Secs. B-C Resp. at B-32-33, Ex. B-6 (C.R. 14-34).  Thus, Baux reported the following LOTs in the home market: 1) direct sales from Baux to unaffiliated customers (LOT 1); 2) downstream sales that Baux's affiliate Bancolor processed and sold to unaffiliated customers (LOT 2); and 3) warehouse sales made by Bancolor's Madrid DC to unaffiliated customers (LOT 3).  <u>See</u> <u>id.</u>  By

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

contrast, Baux only reported one LOT in the U.S. market consisting of "sales made directly from the Baux production plant to the U.S. customer." Secs. B-C Resp. at B-33 (P.R. 40-44).  Baux's U.S. sales were made in the same manner as in Channel 1 in the above chart, i.e., direct factory sales from Spain to the customer.  Accordingly, Baux coded the LOTU on its factory-direct sales as 01 with the corresponding home market LOTH as 01, other home market sales under LOTH 02 and the Madrid DC sales under for LOTH 03 as 03 according to their differing sales channels and selling functions.   See id. at B-32-33, C-30.

Commerce erroneously compared [ ███████████████████████████████████

████████████████████████████████████████████ ].  See Mem. from Colin Thrasher to the File re: Final Results Analysis Memorandum for Compania Valenciana de Aluminio Baux, S.L.U./Bancolor Baux, S.L.U. (collectively, Baux) at Attach. 3 (Nov. 1, 2023) (C.R. 153-159).  Given that this LOT is the most remote from LOT 1, it represented the worst possible type of sale to compare to Baux's direct factory sale to its U.S. customer.

Consistent with this sales channel, Baux explained that:

A {LOT} adjustment is appropriate in this case to recognize the higher levels of selling activities and selling prices that occur as the merchandise moves down the distribution chain from the Baux aluminum production plant to the Bancolor Elche painting facility, from where it is sold either to unaffiliated customers of {sic} moved to the distribution warehouse in Madrid . . . Further, while the Baux plant and the Bancolor Elche plants are focused on serving a smaller number of large-volume customers, the Madrid DC is focused on serving a large number of small-volume customers.

Secs. B-C. Resp. at B-33 (internal citations omitted) (P.R. 40-44).

In support of its request for a LOT adjustment, Baux categorized its selling functions by assigning numeric values for these levels ranging from zero to ten to reflect their relative intensity levels.  See Sec. A Resp. at Ex. A-19 (C.R. 5-12).   In response to a supplemental questionnaire, Baux later updated and expanded its selling functions chart as follows:

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

[



].

Letter on Behalf of Baux to Commerce re: Supp. Sec. A Resp. at Ex. A-19 (Revised) (Jan. 17, 2023) ("Supp. Sec. A Resp.") (C.R. 62).

Baux grouped these activities into five selling function categories: provision of sales support; provision of training services; provision of technical support; provision of logistical services; and performance of sales-related administrative activities. See Case Brief at 5 (P.R. 120-122). The red-highlighted cells represent instances where Baux identified differences in the selling functions performed among the LOTs in the U.S. and home markets. See id. Baux reported

6

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

multiple selling functions that it performed at one or more LOTs but not others.  See id.  These

can be seen in the table above where a row has a "Yes" in one of the columns and the same row

has a "No" in another column.  See id.  Selling functions that Baux or its affiliates performed in

LOTs 2 and 3 and not LOT 1 (or vice versa) include: [ ████████████████████████

████████████████████████████████████████████████ ].  See id. at 6

(C.R. 146-148).   Further, Baux reported additional selling functions related to slitting, cutting to

length, painting, and repacking services by Bancolor and Madrid DC performed in LOTs 2 and 3

that Baux did not perform in LOT 1.  See id. (P.R. 120-122).

       In addition to the differing selling functions performed in LOTs 2 and 3 in the home market

as compared to LOT 1 in the United States, Baux also explained that it had selling functions that

it performed at all channels/LOTs but at different levels of intensity.  See Prelim. Dec. Mem. at 10

(P.R. 97).   Baux reported these differences by following Commerce's instructions in its AD

questionnaire to code selling functions on a scale of 0-10 according to the level of intensity.  See

Sec. A Resp. at A-15 (P.R. 32-33); see also Supp. Sec. A Resp. at Ex. A-19 (revised) (C.R. 62).

       In response to Commerce's supplemental questionnaires, Baux provided additional

documentation, including a prior determination with analogous facts to this action where

Commerce found the existence of different LOTs.  See Sec. A Resp. at Exs. A-5, A-6, A-17 (C.R.

5-12); Supp. Sec. A Resp. at Ex. SA-3 (C.R. 62); Letter on Behalf of Baux to Dep't of Commerce

re: Supplemental Section A-C Questionnaire Response Part I – Section B, Questions 8 & 9 at Ex.

2SB-2 (Mar. 30, 2023) ("Supp. Secs. A-C Resp. Part I") (C.R. 114-116); Letter on Behalf of Baux

to Dep't of Commerce re: Supplemental Section A-C Questionnaire Response Part II at 4-12, Ex.

2SC-2 (Apr. 7, 2023) ("Supp. Secs. A-C Resp. Part II") (C.R. 117-125).

On May 5, 2023, Commerce published the Preliminary Results.  See <u>Prelim. Results</u>, 88 Fed. Reg. at 29,090 (P.R. 103).  Commerce preliminarily found Baux did not support its claim that it sold CAAS at three distinct LOTs in the home market because it failed to submit sufficient documentation establishing substantial differences in the selling activities performed in the three LOTs.  <u>See</u> Prelim. Dec. Mem. at 10 (P.R. 97).  Commerce found that only one LOT existed in the home market and did not make a LOT adjustment to Baux's AD margin.  <u>See id.</u> at 12.

Following the Preliminary Results, Commerce verified Baux's responses.  <u>See</u> Final I&D Mem. at 2 (P.R. 134).  Commerce's verification agenda included the following agenda item dedicated to its LOT analysis:

> B.  Discuss and provide support for the reported selling activities, customer categories, sales terms and distribution channels in the United States and the comparison market, referring to your discussion of distribution channels in your questionnaire response.

<u>See</u> Letter from Emily Halle to Jeffrey S. Grimson: Verification Outline (Jun. 15, 2023) ("Verif. Outline") (P.R. 112).  Commerce's verification report, however, only included a <u>one-sentence</u> discussion of the issue: "Company officials explained the previously reported channels of distribution and associated selling functions in the home and U.S market."  Mem. to the File: Verification of the Questionnaire Responses of Compania Valenciana de Aluminio Baux, S.L.U./Bancolor Baux S.L.U. in the Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from Spain at 6 (Aug. 3, 2023) ("Sales Verif. Rep.") (P.R. 115). Commerce did not note anywhere that Baux failed to support its reported selling functions.[1]

---

[1] In addition to requiring Baux to prepare supporting documentation for its reported data, including the selling activities and LOT fields, the Verification Outline noted that Commerce will take new information at verification when "the information corroborates, supports, or clarifies information already on the record."  Verif. Outline at 2 (P.R. 112).  The verification exhibits confirm that Commerce took no information Baux had prepared (as required by the Outline) to support its selling activities related to the LOT issue.  <u>See</u> Letter on Behalf of Baux to Commerce re:

Commerce's verification outline also required that Baux prepare "a complete set of documents…supporting all sale-specific information listed in the U.S. or comparison sales files you reported to Commerce." Verif. Outline at 10 (P.R. 112). Commerce noted that the Commerce verifier "will check each column… of the sales files against the documents." Id. Among the fields specified by Commerce were the LOT fields, LOTH and LOTU. See id. at 11-12. Commerce did, in fact, examine the LOTH and LOTU fields:

> Using the documents in each sales trace package, it was possible to examine the following sales responses data fields: PRODCODH/U DESCRH/U, CONNUMH/U, SELLERH, CUSCODH CUSCODU/U, CCUSCODH/U, CUSRELH, CUSCATH/U, CHANNELH/U, SALINDTH/U, SALEDATH/U, INVOICEH/U, INVLINEH/U, SHIPDATH/U, PAYDATEH/U, SALETERH/U, PAYTERMH/U, QTYH/U, QTYUNITH/U, QTY2H/U, GRSUPRH/U, GROSSVALUEH, GROSSVALUE1H/ 2H/3H, BILLADJH/U, EARLPYH, REBATEH, **LOTH/LOTU**, INLFTC1H, DESTH, COMMH, SELAGENH, SELARELH, MFRH/U, SALEU, QTYUNITU, QTY2UNIT, GRSUPRU_KG, GRSUPR2U, QTYDISU, DINLFTPU, INSUREU, DBROKU, INTFRU, MARNINU MARNINU_KG, INLFPWU, USINSURU, ENTRYDTU, FRTREVU, INSREVU, DESTU, STATEU, ENTVALUE, and IMPORTER.

Sales Verif. Rep. at 11 (P.R. 115) (emphasis added). Verification Exhibits V-9 through V-12 each have a summary page showing all the data fields examined by Commerce for the relevant transactions. See Verif. Exhibits at Ex V-9 to V-12 (C.R. 138-144). Exhibits V-9, V-10 and V-11 all show the LOTH field (home market) and Exhibit V-12 shows the LOTU field (United States). See id. The LOT fields examined in each Verification Exhibit are reflected below:

---

Verification Exhibits at Exs. V-9 through V-12 (July 7, 2023) (Proprietary Document) ("Verif. Exhibits") (C.R. 138-144); see also Case Br. at 9 (P.R. 120-122).

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

| Verification Exhibit | LOT Field |
|:---:|:---:|
| V-9 | [ ██████ ] |
| V-10 | [ ██████ ] |
| V-11 | [ ██████ ] |
| V-12 | [ ██████ ] |

See id.  This list covers every single distinct LOT identified by Baux in the home market. Commerce stated that it examined the reported fields, including LOTH and LOTU, and "noted no discrepancies."  Sales Verif. Rep. at 11 (P.R. 115).

On August 18, 2023, Baux submitted a case brief for Commerce's consideration prior to issuing the Final Results.  See Final I&D Mem. at 2, n. 6 (P.R. 134).  Baux argued that Commerce's statutory mandate does not require that it consider the intensity of selling functions when determining whether to grant a LOT adjustment.  See Case Br. at 11-15 (P.R. 120-122).  Further, Baux maintained that Commerce unreasonably found that Baux only made home market sales in one LOT.  See id. at 6-7.

On November 7, 2023, Commerce published the Final Results, calculating an AD margin of 10.38 percent for Baux.  See Final Results, 88 Fed. Reg. at 76,723 (P.R. 140).  Commerce found that its LOT test was in accordance with its statutory framework.  See Final I&D Mem. at 9-12 (P.R. 134).  Commerce also continued to find that Baux failed to demonstrate the existence of three different LOTs in the home market.  See id. at 14.

**SUMMARY OF THE ARGUMENT**

Commerce's determination that only one LOT existed in Baux's home market, and failure to make a corresponding LOT adjustment, was not supported by substantial evidence and was otherwise not in accordance with law

First, Commerce's test for determining the existence of a different LOT under 19 C.F.R. § 351.412(c)(2) is not in accordance with law. In determining whether a difference in LOTs exists, Commerce inserted a level of intensity requirement, i.e., that a "substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." 19 C.F.R. § 351.412(c)(2) (emphasis added). Commerce's interpretation of its regulation is unreasonable under Chevron Step 2. Commerce's intensity requirement conflicts with its statutory mandate that Commerce "shall" make a LOT adjustment based on the "performance of different selling activities." 19 U.S.C. § 1677b(a)(7)(A)(i) (emphasis added). In other words, a LOT adjustment is mandated when there is any difference in selling functions. Further, Commerce's intensity requirement unlawfully tightens a test that Congress designed to ensure a fair comparison between NV and EP or CEP.

Second, beyond this threshold legal issue, Commerce's underlying factual determination that Baux's home market consisted of one LOT was not supported by substantial evidence and was otherwise not in accordance with law. Commerce either failed to provide a reasonable explanation for treating this case differently than past determinations where Commerce found nearly identical facts sufficient to establish a difference in LOTs or outright ignored evidence that detracted from its preferred conclusion that only one LOT existed in the home market. The only reasonable reading of the record is that three distinct LOTs existed in Baux's home market given that: 1) different channels of distribution existed in the home market whereby Bancolor and Madrid DC

11

served as resellers of Baux's CAAS, 2) Bancolor and Madrid DC performed different selling functions in the home market and 3) where Baux and its affiliates performed the same selling functions in all three LOTs in the home market, they did so a differing intensity levels.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence requires "more than a mere scintilla," e.g., Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir. 2020), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the "record... fairly detracts from {its weight}." Changzhou Trina, 975 F.3d at 1326 (quoting SolarWorld Ams., Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018)). Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable." NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Commerce's determination must be overturned if it is "arbitrary, capricious, {or} an abuse of discretion." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard requires that "Commerce's determination is the product of reasoned decision making" or "a reasoned explanation." Canadian Solar, Inc. v. United States, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44

(1983)).  Further, "{a}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."  RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002)

Courts review an agency's interpretation of its own regulations under the two-prong standard established in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43 (1984).[2]  See United States v. Haggar Apparel Co., 526 U.S. 380, 394 (1999) ("{T}he Court of International Trade must, when appropriate, give regulations Chevron deference."); Aqua Prods., Inc. v. Matal, 872 F.3d 1290, 1316 (Fed. Cir. 2017) (en banc) ("We use the same interpretive rules to construe regulations as we do statutes{.}").  Under Chevron, this Court must first determine whether Congress' intent can be ascertained; if it can, the Court "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 843.  If the statute is ambiguous, however, a court must still determine whether the agency's implementation of the statute through its regulation is permissible.  See id. at 843-44.  A court can only uphold Commerce's interpretations that are reasonable.  See id. at 844.

## ARGUMENT

### I.    COMMERCE'S REGULATORY TEST FOR DETERMINING DIFFERENCES IN LOTS CONFLICTS WITH ITS STATUTORY MANDATE TO CALCULATE A FAIR COMPARISON PRICE

In the Final Results, Commerce wrongfully determined that its test to determine the existence of a different LOT under 19 C.F.R. § 351.412(c)(2) complies with its statutory mandate under 19 U.S.C. § 1677b to compare NV to the EP or CEP at the same LOT.  See Final I&D Mem.

---

[2] Chevron deference is currently on review at the Supreme Court.  See Loper Bright Enterprises v. Raimondo, No. 22-451.  In Loper, the Supreme Court may limit the amount of deference owed to an Executive agency's interpretations of its own statute.  Baux reserves the right to revisit the application of Chevron deference in this case to the extent it is overturned by the Supreme Court.

at 9 (P.R. 134).  Commerce's interpretation of its regulations is unreasonable under <u>Chevron</u> Step 2.

### A.  Commerce's Regulatory Test Unlawfully Limits the Adjustment Mandated by the Statute

"Antidumping laws intend to calculate antidumping duties on a fair and equitable basis." <u>SNR Roulements v. United States</u>, 402 F.3d 1358, 1363 (Fed. Cir. 2005).  In an AD investigation, "the amount of the duty to be imposed, otherwise known as the 'dumping margin,' is the amount by which the price charged for the subject merchandise in the home market (the 'normal value') exceeds the price charged in the United States (the 'U.S. price')." <u>Micron Tech., Inc. v. United States</u>, 243 F.3d 1301, 1303 (Fed. Cir. 2001) (quoting 19 U.S.C. §§ 1673, 1677(25)(A)).  "The U.S. price is calculated by using one of two statutorily-prescribed methodologies – {EP} or {CEP}." <u>Id.</u> (quoting 19 U.S.C. § 1677a(a)-(b)).

Commerce's statutory framework ensures that "a fair comparison shall be made between the {EP} or {CEP} and {NV}."  19 U.S.C. § 1677b(a).  Specifically, in calculating a fair comparison price, the statute  requires that "the normal value of the subject merchandise <u>shall</u> be the price . . . at a time reasonably corresponding to the sale used to determine the {EP} or {CEP}." <u>Id.</u> § 1677b(a)(1)(A) (emphasis added).  When selecting NV (i.e., the comparison market price), Commerce must use:

> (i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, <u>at the same level of trade</u> as the export price or constructed export price.

<u>Id.</u> § 1677b(a)(1)(B)(i) (emphasis added).  Achieving a fair comparison, thus, requires that the EP or CEP be compared to NV at the same LOT.  Although the statute does not "define the phrase

'same level of trade'" it does provide clear direction that an adjustment "shall" be made to NV if

certain conditions are met as detailed below.  <u>Micron</u>, 243 F.3d at 1305.

     Where the EP or CEP cannot be compared with NV at the same LOT, to achieve a fair

comparison, the statute requires that:

> {t}he price described in paragraph (1)(B) <u>shall</u> also be increased or
> decreased to make due allowance for <u>any difference</u> (or lack
> thereof) between the export price or constructed export price and
> the price described in paragraph (1)(B) (other than a difference for
> which allowance is otherwise made under this section) that is
> shown to be wholly or partly due to a <u>difference</u> in level of trade
> between the export price or constructed export price and normal
> value, if the difference in level of trade—
>
>> (i)involves the performance of <u>different</u> selling activities;
>> and
>>
>> (ii)is demonstrated to affect price comparability, based on a
>> pattern of consistent price differences between sales at
>> different levels of trade in the country in which normal value
>> is determined.
>
> In a case described in the preceding sentence, the amount of the
> adjustment shall be based on the price differences between the two
> levels of trade in the country in which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A) (emphasis added); <u>see also</u> <u>Micron</u>, 243 F.3d at 1314 (finding that the

LOT adjustment ensures that the NV and U.S. price are compared "at the same marketing stage in

the chain of distribution that begins with the manufacturer").[3]

     The statute requires Commerce to answer two questions in determining whether it should

make a LOT adjustment.  First, is there a <u>difference</u> in LOT between the NV and EP or CEP due

to performance of "<u>different</u> selling activities" in the home and foreign markets?  19 U.S.C. §

---

[3] The statute also addresses additional adjustments related to the LOT where CEP is used that is
not relevant to Baux's case because all of Baux's U.S. sales were based on an EP. <u>See</u> 19 U.S.C.
§ 1677b(a)(7)(B).

1677b(a)(7)(A)(i) (emphasis added).  If not, then the inquiry stops.  Second, if there is a difference in LOTs based on the performance of "different selling activities," Commerce must analyze whether these differences affected "price comparability" such that there is "pattern of consistent price differences between sales at different levels of trade in the {home market}."  Id. § 1677b(a)(7)(A)(ii).   If both conditions are met, then Commerce "shall" make an adjustment that disregards other "allowances" in this section (reported price adjustments in the U.S. and home market database) "to make due allowance for any difference . . . between the {EP} or {CEP} and {NV}."  Id.

Commerce promulgated regulations setting forth the test that it uses to determine whether there are differences in LOTs.  See 19 C.F.R. § 351.412(c)(2).  Commerce's regulations provide that it "will determine that sales are made a different {LOTs} if they are made at different marketing stages (or their equivalent)."  Id.  Ignoring the statutory language mandating when Commerce must make a LOT adjustment, which only requires the performance "different" selling activities as a necessary condition to make LOT adjustment, Commerce's implementing regulations state that "substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing."  Id. (emphasis added).  Commerce, therefore, inserted a level of intensity framework in determining whether there is a difference in LOTs that is not present in the statute.

**B.  Commerce's Interpretation Fails Under <u>Chevron</u> Step 2**

Commerce's test to determine whether there is a difference in LOTs between the two comparison prices under 19 C.F.R. § 351.412(c)(2) is not in accordance with law.  Cf. Final I&D Mem. at 12 (P.R. 134).  The statute does not define LOT.  See id. at 10.  Nonetheless, Commerce's regulatory test to determine the existence of difference in a LOTs is not a permissible reading of

Commerce's statutory obligations under 19 U.S.C. § 1677b.  First, Commerce created a circular test that conflicts with the plain language of 19 U.S.C. § 1677b(7)(A)(i) mandating when Commerce must make a LOT adjustment.  Second, Commerce cherry picked language from the Statement of Administration Action ("SAA") instead of focusing on the fact that the underlying purpose of a LOT adjustment under 19 U.S.C. § 1677b(a) is to make "a fair comparison shall be made between the export price or constructed export price and normal value."  The only permissible reading of the statute is that the existence of a difference in selling activities between the NV and EP or CEP prices, as opposed to Commerce's current test requiring a difference in the level of intensities of these selling activities, is sufficient to establish a difference in LOTs. Commerce's regulatory test, therefore, fails under <u>Chevron</u> Step 2.

Commerce wrongly concluded that the statute and its regulation are not in conflict.  <u>See</u> Final I&D Mem. at 9 (P.R. 134).  Commerce acknowledged that 19 U.S.C. § 1677b(7)(A)(i) refers to "performance of <u>different</u> selling activities" and 19 C.F.R. § 351.412(c) references "<u>substantial</u> differences in selling activities."  <u>Id.</u> (emphasis added).  Commerce, however, concluded that its regulations do not conflict 19 U.S.C. § 1677b(7)(A)(i) because this statutory provision refers to a different segment of Commerce's LOT analysis.  <u>See</u> <u>id.</u> at 10.  According to Commerce, 19 U.S.C. § 1677b(7)(A)(i) "directs Commerce as how to proceed once Commerce has determined that a difference in LOTs exists" and "in order for the statutory provision to apply, Commerce <u>must have already found</u> that the U.S. LOT differs from one or more LOTs in the comparison market."  <u>Id.</u> For this reason, Commerce found that 19 U.S.C. § 1677b(7)(A)(i) "does not require Commerce to define an LOT where there are 'any differences' in selling activities; it merely indicates how to account for these differences if, and only if, Commerce finds that multiple LOTs exist."  <u>Id.</u>

17

Commerce wrongfully applied principles of statutory interpretation in determining that its regulation comported with its statutory mandate.  Commerce interpreted the fact that 19 U.S.C. § 1677 does not provide a definition of LOT as providing it with near unlimited discretion to promulgate a regulation to fill this gap.  See id.  A statute, however, must be read as "consonant with 'the provisions of the whole law, and . . . its object and policy.'"  Holloway v. United States, 526 U.S. 1, 9 (1999) (citation omitted).  Not only do statutory interpretations require that a statute be read as a whole but it is a "'cardinal principle of statutory construction' . . . {that a Court must} 'to give effect, if possible, to every clause and word of a statute' . . . rather than to emasculate an entire section."  Bennett v. Spear, 520 U.S. 154, 173 (1997) (internal citation omitted).  Commerce's test to determine whether a difference in LOTs exists is unreasonable because it in effect renders 19 U.S.C. § 1677b(7)(A)(i) superfluous as detailed below.

The language of 19 U.S.C. § 1677b(7)(A)(i) is plain and unambiguous.  When "the statutory language is plain," the Court "must enforce it according to its terms."  Arista Networks, Inc. v. Cisco Sys., Inc., 908 F.3d 792, 803 (Fed. Cir. 2018) (quoting King v. Burwell, 576 U.S. 473, 486 (2015)).  Section 1677b(a)(7) establishes that Commerce "shall" adjust NV when there is a difference in level in trade relating to the performance of "different selling activities."  19 U.S.C. § 1677b(a)(7)(A)(i).  Indeed, Section 1677b(a)(7) further states that Commerce must make due allowance for "any difference" between the EP and CEP and NV.  The statutory language is plain -- the only prerequisite for the existence of a different LOT is "the performance of different selling activities."  19 U.S.C. § 1677b(a)(7)(A).

Commerce's regulation unlawfully restricted the statutory LOT adjustment test, requiring a substantial difference versus just differences in LOTs to grant an adjustment.  Compare 19 U.S.C. § 1677b(a)(7)(A)(i), with 19 C.F.R. § 351.412(c)(2).  Commerce's interpretation that its regulation

comports with the statute creates a circular problem where a difference in LOT may not exist under Commerce's unlawful test (if there are not substantial difference in selling differences) but Commerce is nevertheless statutorily required to make a LOT adjustment because there are different selling activities occurring in the home and foreign markets. Commerce's interpretation that a difference in LOTs only exists where substantial differences in selling activities exist is unreasonable because it unlawfully renders 19 U.S.C. § 1677b(7)(A)(i) superfluous in certain circumstances.

Further, Commerce's finding that an "analysis of selling activities alone is insufficient to establish the LOT" cherry picks language from the SAA while ignoring language that conflicts with Commerce's preferred conclusion that different selling activities alone are insufficient to establish the existence of distinct LOTs. Final I&D Mem. at 11 (P.R. 134) (quoting Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27,296, 27,370 (Dep't Commerce June 18, 1997) ("Preamble")). In concluding that 19 C.F.R. § 351.412(c)(2) is not contrary to the statute, Commerce relied on the Preamble underlying the promulgation of its regulation. See Final I&D Mem. at 10-12 (P.R. 134). In the Preamble, Commerce explained that the SAA provides that Commerce "need not find that two {LOTs} involve no common selling activities before finding two {LOTs}" and that "two sales with some common selling activities nevertheless may be a different {LOTs}." Id. at 10-11 (quoting Preamble, 62 Fed. Reg. at 27,371). According to Commerce, the SAA requires that Commerce "must analyze selling functions to determine if {LOTs} identified by a party are meaningful." Final I&D Mem. at 11 (P.R. 134). Commerce also noted that "the SAA contemplates that, within a given LOT, the selling functions may differ." Id. Commerce, however, cherry picked language from the SAA and ignored that the SAA also confirms that Commerce "shall either: (1) establish the normal value at a level of trade equivalent

to the level of trade of the constructed export price; or (2) make due allowance as warranted." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, at 829 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4167-68 (emphasis added). In determining whether an adjustment is necessary, the SAA confirms that Commerce "shall adjust normal value to account for any differences in these prices that are demonstrated to be attributable to differences in the level of trade of the comparison sales in each market." Id; see also id. ("Commerce will grant such adjustments only where. . . there is a difference in the level of trade (i.e., there is a difference between the actual functions performed by the sellers at the different levels of trade in the two markets."). Congress required that there be an adjustment conditional for "any" differences or "a" difference – not a "substantial" difference and not something more than a difference as Commerce's test requires. Commerce's test for determining the existence of different LOTs as promulgated in 19 C.F.R. § 351.412(c)(2), therefore, may conflict with certain instances where the statute mandates that Commerce make an adjustment to NV. The only reasonable interpretation that avoids this conflict is that any difference in selling activities can establish distinct LOTs, large or small.[4]

Finally, Commerce's conclusion that 19 C.F.R. § 351.412(c)(2) comports with its statutory mandate ignores the underlying "purposes Congress sought to serve" in drafting 19 U.S.C. §1677b. Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608 (1979). Congress drafted 19 U.S.C. § 1677b to ensure that Commerce calculates the NV to achieve "a fair comparison with the {EP} or {CEP}." 19 U.S.C. § 1677b. The Federal Circuit in Micron explained that "the overarching purpose of the antidumping statute is to permit a 'fair, 'apple-to-apples'' comparison between the

---

[4] The statutory test is outcome-neutral, requiring an adjustment for "price differences" without regard to whether the adjustment results in a higher or lower dumping margin. 19 U.S.C. § 1677b(7)(A)(ii).

foreign market value and United States." 243 F.3d at 1313 (quoting <u>Torrington Co. v. United</u> <u>States</u>, 68 F.3d 1347 (Fed. Cir. 1995)); <u>see also</u> <u>Universal Tube & Plastic Indus. v. United States</u>, __ CIT __, __, 586 F. Supp. 3d 1312, 1317 (2022) ("Fundamental to antidumping duty determinations is the obligation of Commerce, imposed by section 773(a) of the Tariff Act, to make a 'fair comparison' between the U.S. price . . . and normal value."). Commerce unlawfully tightens its test for defining distinct LOTs when instead the statute should be read broadly to ensure a fair comparison between NV and EP or CEP.

In short, Commerce unreasonably interpreted its statutory obligations when promulgating its LOT analysis under 19 C.F.R. § 351.412(c)(2). Commerce's requirement that the record demonstrate "substantial differences in selling activities" as a necessary condition to finding the existence of different LOTs fails under <u>Chevron</u> Step 2 because Commerce's regulation conflicts with both the statute and its purpose to ensure a fair comparison between prices. Commerce's unlawful interpretation of its statutory mandate to make a LOT adjustment directly harmed Baux by resulting in Commerce making an unfair comparison between NV and EP at different LOTs. For these reasons, this Court should invalidate Commerce's LOT test under 19 C.F.R. § 351.412(c)(2) and remand this action back to Commerce with instructions to analyze whether a different LOTs existed in Baux's home market based on the "differences in selling activities."

## II.   COMMERCE'S DETERMINATION OF ONE LOT WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS OTHERWISE NOT IN ACCORDANCE WITH LAW

Once the proper test is applied, the only reasonable reading of the record is that a LOT adjustment was necessary because Baux performed different selling functions with respect to its sales used to calculate NV and EP. Substantial evidence, <u>including information Commerce</u> <u>verified</u>, demonstrated that there were three distinct LOTs in the home market given that: 1) different channels of distribution existed in the home market, 2) Baux and its affiliates performed

completely different selling functions, as opposed to mere different selling activities, in the home market and 3) Baux and its affiliates performed various selling functions at different intensity levels in the home market.

### A. Substantial Evidence Established Different Channels of Distribution in the Home Market

Commerce's determination that Baux made sales in the home market at a single LOT was not supported by record evidence and was otherwise not in accordance with law because Commerce acted arbitrarily by providing "insufficient reasons" for treating Baux's sales differently than other cases where Commerce found that different LOTs existed when a respondent made sales through different channels of distribution in the home market. RHP Bearings, 288 F.3d at 1347.

Commerce has previously found that the existence of different channels of distribution, such as direct-factory sales compared to sales by a reseller using inventory in a distribution center, represents the likely existence of different LOTs in the home market. See Certain Fabricated Structural Steel from Mexico, 85 Fed. Reg. 5,390 (Dep't of Commerce Jan 30, 2020), and accompanying I&D Mem. at Cmt. 8 ("{T}he merchandise does not necessarily have to change hands twice in order to reach the more remote LOT ... { and it} is sufficient that, at the more remote level, the seller takes on a role comparable to a reseller if the merchandise had changed hands twice." (internal citation omitted)). For instance, in Cold-Rolled Steel Flat Products from the United Kingdom ("CRS from the UK"), Commerce concluded that "{i}t is our view that direct sales from the mill and sales through a distribution center represent two different stages in the marketing process." Certain Cold-Rolled Steel Flat Products Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 49,929 (July 20, 2016), and accompanying I&D Mem. at 8-10 ("CRS from the UK I&D Mem."); see also Stainless Steel Bar from Brazil: Preliminary Results of

Antidumping Duty Administrative Review: 2013-2014, 79 Fed. Reg. 75,789 (December 15, 2014) ("SS Bar from Brazil"), and accompanying Preliminary I&D Mem. at 8 ("SS Bar from Brazil I&D Mem.") ("In the home market, Villares reported two channels of distribution: direct mill-order sales to distributors and large end-users, and sales to end-users from inventory maintained in Villares' distribution centers located at the company's headquarters and in Joinville, Brazil.").[5]  In sum, Commerce has previously found that sales from producers and sales from resellers using product stored in inventory represent different LOTs because the reseller often performs the same activities twice or the reseller performs separative activities.

Commerce acted unlawfully in treating Baux's home market sales differently than the above cases where Commerce found that the existence of different distribution channels correlates with distinct LOTs.  Here, no "reasonable mind might accept as adequate{,}" Huayin, 322 F.3d at 1374, Commerce's conclusion that "while Baux described the customers of Bancolor's/Madrid DC differently from its own customers, the Madrid DC's customers are not necessarily more remote from the factory."  Final I&D Mem. at 15 (P.R. 134).  Baux sold CAAS from its factory to a more remote level, i.e., its affiliates Bancolor and Madrid DC, and these companies took on a

---

[5] Although Commerce found that there were two channels of distribution in CRS from the UK and SS Bar from Brazil, its nonetheless concluded that its past finding that different LOTs existed in those cases did not require a similar finding in this case.  See Final I&D Mem. at 15 (P.R. 134). Commerce maintains that in both CRS from the UK and SS Bar from Brazil "it reviewed the selling functions reported for the claimed channels of distribution and determined whether such differences warranted the finding of distinct marketing stages."  Id.  Commerce's analysis in both cases, however, supports the existence of two LOTs in Baux's home market.  In finding that the different LOTs existed in the home market in CRS from the UK, Commerce noted that a "selling function {was} performed at one channel but was not performed at all at the other channel." CRS from the UK I&D Mem. at 8.  Such a fact pattern exists here too with respect to Baux's home market.  Similarly, Commerce analyzed that certain selling differences existed in the distinct LOTs in SS Bar from Brazil, such as the maintenance and inventory and technical services, that also exist with respect to Baux.  See SS Bar from Brazil I&D Mem. at 8.

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

role comparable to a reseller after the product changed hands.  See Case Br. at 25 (P.R. 120-122).

Commerce confirmed at verification that [ ████████ ] of Baux's sales during the POR were to

one customer, Bancolor.  See Verif. Exhibits at Ex. V-6 (C.R. 138-144).    Bancolor then painted

and slit the unfinished coils it received from Baux and re-sold the further manufactured subject

merchandise.  See Case Br. at 28 (P.R. 120-122).  Madrid DC served as a warehouse for Baux and

Bancolor products, where much smaller customers could purchase aluminum products without

being required to purchase large quantities of merchandise through Baux or Bancolor.  See Letter

on Behalf of Baux to Dep't of Commerce re: Sec. D Resp. at D-6 (Aug. 23, 2022) ("Sec. D Resp.")

(P.R. 45-47).  The average quantity on each Baux invoice was [ ████ ] KG, whereas the average

quantity on a Madrid DC invoice was [ ███ ] KG.  See Case Br. at 35 (C.R. 146-148).  These

data confirm that, whereas Baux sells primarily full coils of aluminum sheet to industrial

consumers like Bancolor and other similar companies, Bancolor and  Madrid DC made sales to a

distinct customer base.  By definition, the Bancolor and the Madrid DC customers are more remote

as they are further down the supply chain than the direct sales by Baux to its customers.

Consistent with CRS from the UK and SS Bar from Brazil, where Commerce found that

the existence of a reseller arrangement supported the existence of different LOTs, here too

Bancolor's and Madrid DC's role as reseller represented substantial evidence that different LOTs

existed in Baux's home market.  Commerce failed to provide a reasonable explanation for treating

Baux's home market sales differently than these cases by finding that only one LOT existed in the

home market.

**B. Substantial Evidence Established that Baux Performed Different Selling Functions, as Opposed to Mere Selling Activities, in One LOT But Not Others in the Home Market**

Commerce provided "insufficient reasons" for treating Baux's sales differently than other cases where Commerce has found the existence of different LOTs when certain selling functions were performed in one sales channel but not another.  RHP Bearings, 288 F.3d at 1347.  Here, the record demonstrated that Bancolor and Madrid DC performed several selling functions in certain sales channels in the home market (i.e., LOTs 2 and 3) – i.e., warehousing (logistical services), small customer support and commissions –  that Baux did not perform with respect to its factory-direct sales in the United States and the home market (i.e., LOT 1).  Commerce's determination that Baux's home market consisted of a single LOT was not supported by substantial evidence and was otherwise not in accordance with law given that these differences are not a matter of degree but rather, the complete absence of the selling function in different channels in the home market.

> *i.  A Difference in a Selling Function Is Sufficient to Establish the Existence of Different LOTs*

Commerce finding that a difference in selling functions, as opposed to a mere difference in selling activities that are performed as part of that selling function, is insufficient to establish a difference in LOTs conflicts with its prior determinations as well as court precedent.  See Final I&D Mem. at 16 (P.R. 134).  In Emulsion Styrene-Butadiene Rubber from Brazil, Commerce cited to the Court's decision in Pasta Zara Spa v. United States, 34 CIT 355 (2010) ("Pasta Zara I"), where the court explained that: "{t}he *Preamble* draws a distinction between mere differences in selling activities and differences in selling activities that establish a different selling *function.*" Emulsion Styrene-Butadiene Rubber from Brazil:  Final Results of Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg. 38,847 (Jun. 29, 2020), and accompanying I&D

Mem. at Cmt 1, n. 50 (citing Pasta Zara I, 34 CIT at 366).   In Pasta Zara I, the CIT quoted

Commerce's own Preamble stating that:

> It is *sufficient* that, at the more remote level (i.e., more remote from the factory), the seller takes on a role comparable to that of a reseller if the merchandise had changed hands twice.  For example, a producer that normally sells to distributors (that, in turn, resell to industrial consumers) could make some sales directly, taking over the functions normally performed by the distributors.  Such sales would be at the same LOT as the sales through the distributors. Each more remote level must be characterized by an additional layer of selling activities, amounting in the aggregate to a substantially different selling function.

Pasta Zara I, 34 CIT at 363 (citation omitted).  In other words, Commerce's Preamble dictates that

a difference in selling functions is sufficient to establish the existence of different LOTs.

Commerce misconstrued the above-quoted language in concluding that it must find

"substantial" differences in either a selling activity or function to warrant a finding that there is a

difference in LOTs.  See Final I&D Mem. at 15 (P.R. 134).  Commerce's conclusion conflicts with

the court's holding in Pasta Zara I that "demonstrating adequately a different selling function, as

opposed to demonstrating merely a difference in selling activities, would be 'sufficient'" to

establish a difference in LOTs.  Id., 34 CIT at 364.  The court, thus, held that the Commerce's own

Preamble mandates that the existence of a different selling function is sufficient to establish

difference in LOTs.

Commerce is wrong that the Court affirmed its finding on remand in Pasta Zara SpA v.

United States, 35 CIT 620 (2011) ("Pasta Zara II") that "the existence of different selling activities

is not sufficient to demonstrate that a different in LOTs exist."  Final I&D Mem. at 16 (P.R.  134)

(citation omitted).   In Pasta Zara II, the court reiterated that a difference in LOTs "must be

characterized by an additional layer of selling activities, amounting in the aggregate to

substantially different selling function."  Id., 35 CIT at 624.  At issue on remand in Pasta Zara II

was whether a respondent performed different selling functions for two groups of customers in the

26

home market: "traditional local" and "mass-market" customers.    Id. at 623.   In sustaining Commerce's remand redetermination, the court found that Commerce supported with substantial evidence that the selling activities performed by the respondent failed to establish the existence of distinct selling functions between the traditional local and mass-market customers.  See id. at 625. The Court noted that the respondent did not perform "separate storage, handling, or loading activities" for the two sets of customers where the respondent claimed that different LOTs existed in the home market.  See id. The facts in this appeal are distinguishable because Baux did perform such different selling functions, as demonstrated below, including the provision of warehousing services in certain channels of sales and not others in the home market.  The Court's holding in Pasta Zara II, therefore, establishes that the performance of different selling functions, regardless of their intensities, is sufficient to establish the existence of different LOTs.

Commerce cannot lawfully find the performance of a different selling function in one sales channel but not another in the home market to be sufficient to find the existence of distinct LOTs in one case while rejecting such an argument here. See RHP Bearings, 288 F.3d at 1347.

    ii. *Baux Performed Warehousing Services in Certain Sales Channels But Not Others in the Home Market*

Commerce failed to consider substantial evidence on the record that "fairly detracted{ed}" from the weight of its conclusion that Baux's home market only consisted of a single LOT – namely, that Baux performed an entirely separate selling function, warehousing (logistical services), in certain sales channels in the home market but not others. Changzhou Trina, 975 F.3d at 1326.  Commerce itself identified Warehousing as a selling function by listing it in the selling functions chart within "Provision of Logistical Services."  Letter from Emily Halle to Jeffrey S. Grimson re: Initial Questionnaire at A-15 (Jun. 17, 2022) ("AD Q'naire") (P.R. 16-17). Substantial evidence established that warehousing occurred with respect to home market sales

channels at multiple LOTs but <u>not</u> with respect to sales to LOT 1, corresponding to Baux's factory-direct sales. Commerce did not dispute this factual premise but instead incorrectly found that these differences were not relevant to its LOT analysis because it had already accounted for them in other portions of its AD margin calculation. <u>See</u> Final I&D Mem. at 16 (P.R. 134). Commerce's mandate to move these expenses from being reported specifically for the sales for which this processing occurred into Baux's reported costs, necessarily results in a lack of price comparability between LOTs even within the same CONNUM.

For Channel 1 sales at LOT 1, which include sales both to the United States and in the home market, Baux reported that it did <u>not</u> provide any warehousing functions. <u>See</u> <u>infra</u>. Baux explained that:

> All production at Baux is to order. As a result, the quantity of finished goods inventory is always very small: the average time between the finished product coming off the production line (i.e., the production date) and the product being shipped to the customer (i.e., the date of shipment and invoicing) is less than 3 days.

Case Br. at 27 (P.R. 120-122). As Baux maintained virtually no finished goods inventory, there simply was no possibility for it to perform any warehousing services for sales made via Channel 1 at LOT 1. <u>See</u> Case Br. at 28 (P.R. 120-122). For this reason, in response to Commerce's selling activities chart, Baux reported that it did not perform warehousing services at this LOT. <u>See</u> Supp. Sec. A Resp. at Ex. A-19 (Revised) (C.R. 62).

In contrast, where Bancolor and Madrid DC resold CAAS through the other channels besides Channel 1 sales at LOT 1 in the home market, substantial evidence on the record established that warehouse selling functions not only existed but also at markedly different intensities depending on the channel of trade. While Baux itself has sales to unrelated buyers direct from the factory, including in Spain and for sales to the United States, most of Baux's CAAS was first sold to Bancolor, with a very small quantity sold directly to Madrid DC. <u>See</u> Case Br. at

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

28 (P.R. 120-122).  Bancolor then further processed the merchandise it received from Baux into

painted coils and sold that merchandise, and Madrid DC warehoused and sold CAAS sheet in coils

produced by Baux and painted and slit coils produced by Bancolor to smaller unrelated customers.

See id; see also Sec. A Resp. at A-16 (P.R. 32-33) ("Bancolor's primary business activity is the

purchase, further manufacture by slitting and painting, and resale of Baux-produced CAAS.").

Unlike at Baux, product remained in inventory at Bancolor and Madrid DC for considerably longer

time periods.  See Secs. B-C Resp. at Ex. B-18 (C.R. 14-34) (showing time in inventory at Baux

of [ ████████ ], Bancolor at [ ████████ ] and Madrid DC at [ ████████ ]).  The Madrid DC

product remained in inventory alone nearly [ ████████████████████████ ].  See id.

Commerce verified these figures.  See Sales Verif. Rep. at 14 (P.R. 115)  ("{w}e reviewed the

inventory carrying costs calculated for the home market and U.S. sales in the fields DINVCARU,

DINVCARU_KG, INVCAR1H, INVCAR2H, INVCAR3H").[6]  The only reasonable conclusion

is that the level of warehouse selling functions are higher for Bancolor (LOT 2) and Madrid DC

(LOT 3) sales than for Baux's factory-direct sales to unaffiliated customers (LOT 1) given that

product sold through the Bancolor (especially the Madrid DC) channels remained in inventory for

significantly longer periods.

    In addition, Baux submitted record evidence establishing the high intensity of warehousing

activities performed by Madrid DC's personnel.  See Verif. Exhibits at Ex. V-15 (C.R. 138-144)

(presenting at table showing not only the personnel expenses associated with these internal

warehouse services performed by the Madrid DC personnel, but also external warehouse services

---

[6] Commerce found that it did not "verify {Baux}'s claim for adjustment or allow it additional
opportunities to supplement its claim with new factual information during the verification."  Final
I&D Mem. at 18 (P.R. 134).  Commerce, however, verified this information with respect to other
portions of its verification agenda.

that were arranged by Madrid DC personnel); see also Secs. B-C Resp. at Ex. B-12 (C.R. 14-34) (showing calculation of WHSERV2H – Madrid DC Internal Warehousing Services); id. at B-5 ("Additional warehouse services may also be performed at the Madrid DC in response to the Madrid DC's customers' requirements").  Madrid DC performed both internal and external warehousing services.  The internal warehouse services consisted of "re-coiling the merchandise into small coils, slitting and cutting."  Sec. D Resp. at D-6 (P.R. 45-47).  These in-warehouse cutting and slitting services demanded [ ■ ] of the warehouse personnel expenses.  See Case Br. at 41 (C.R. 146-148).    In terms of external services, Madrid DC arranged for "external powder coating and panel sandwiching."  See Letter on Behalf of Baux to Dep't of Commerce re: Baux Supplemental B-C Response at B-11 (Mar. 10, 2023) ("Supp. Secs. B-C Resp.") (P.R. 73) (emphasis added).  For these reasons, in responding to Commerce's selling activities chart, Baux reported warehousing at Madrid DC as a [ ■ ] for intensity, much higher than the levels noted for Baux factory-direct sales (which was none) and Bancolor's sales of painted and slit merchandise. See Supp. Sec. A Resp. at Ex. A-19 (Revised) (C.R. 62).[7]

Commerce did not dispute these facts but instead unlawfully determined that they were "not relevant to the LOT analysis at all."  Final I&D Mem. at 16 (P.R. 134).  Commerce reasoned that the warehousing activities performed by Bancolor and Madrid DC was not relevant to its LOT analysis because it had "already adjusted Baux's home market prices for warehousing expenses." Id.  According to Commerce, it "cannot adjust for expenses already captured . . . ."  Id.  Baux acknowledges that Commerce required it to remove the Madrid DC external warehouse service

---

[7] Bancolor's own resales also incurred additional painting, for example, and indisputably bore the cumulative indirect selling expenses of both Baux (INDIRS1H) and Bancolor (INDIRS2H), confirming a more advanced stage of marketing as noted above.  See Case Br. at 32 (P.R. 120-122).

costs from the sales database and instead to report it in the cost database.  See Supp. Secs. B-C

Resp. at 5 (P.R. 73).  Baux complied with Commerce instructions and submitted an exhibit

documenting its movement of the external warehousing expense from the sales database and into

the cost database.  See Supp. Secs. B-C Resp. at 10, Ex. SBC-7 (C.R. 90-100) (showing detailed

powder coating and panel sandwich expenses incurred as warehouse service expenses for Madrid

DC customers).  Notwithstanding this change, there is no dispute that the extensive warehouse

services occurred at Madrid DC.  It is self-evident that powder-coated and panel-sandwiched

products are able to be sold for higher prices than mill finished products, therefore, these external

processes impacted the price at which the products could be sold.  The removal of the expenses

associated with these services from Baux's sales database results in the treatment of externally

processed merchandise as equivalent to merchandise that did not undergo external processing.  The

result is that Commerce's treatment of sales that undergo different sales processes did not account

for the differences in selling functions attributable to the different levels of trade within which

each product is sold.

Commerce's requirement to move a portion of the warehousing expenses out of the sales

database to the cost database, contrary to Commerce's incorrect conclusion, highlights the need

for the LOT adjustment, as this is a perfect example of activities occurring at a more advanced

marketing level (Madrid DC) that may have price effects but where associated expenses would not

be accounted for by any otherwise-reported fields deducted in Commerce's margin program.

Commerce's program accounts for LOT price comparability differences after first accounting for

directly-reported price adjustments and, therefore, would never consider expenses associated with

differing levels of trade that are subsumed within the company's costs.  See Final I&D Mem. at

16 (P.R. 134).  But by refusing to admit the existence of any LOT differences, Commerce

prevented its own program from making a fair comparison and accounting for any and all such LOT price effects not already reflected by sales adjustments.

In sum, substantial evidence establishes, nor does Commerce dispute, that (1) Baux did not hold inventory or perform warehousing functions, (2) Baux resold CAAS coils to Bancolor for further processing and Madrid DC, (3) Bancolor sold further processed CAAS to downstream customers at a different marketing stage, and (4) Madrid DC performed warehousing functions that Baux did not, i.e., re-coiling, slitting, cutting, powder-coating and panel sandwiching, and resold merchandise produced by Baux and Bancolor. Commerce failed to consider this evidence on the record because it wrongly found that it had already accounted for warehousing differences in its AD Margin. See Final I&D Mem. at 16 (P.R. 134). Commerce forced, by mandating the inclusion of external processing charges in Baux's reported costs rather than as selling expenses, the improper comparison of certain products sold at different LOTs as if those products were equivalent in all respects. Commerce's failure to consider this evidence thereby rendered it conclusion that Baux's home market only consisted of a single LOT as unsupported by substantial evidence and otherwise not in accordance with law.

### iii. Baux Provided Small Customer Support in Certain Sales Channels But Not at LOT 1

The record also established a difference in selling functions between certain sales channels in the home market because small customer support was not performed by Baux for its factory direct sales (LOT 1) but was performed by Bancolor (LOT 2) albeit to a lesser degree of intensity than Madrid DC (LOT 3). No reasonable reading of the record can support Commerce's finding that "Baux does not point to any record evidence showing that the customer support it provided actually differed between the claimed LOTs." Final I&D Mem. at 17 (P.R. 134). In its case brief, Baux provided a detailed explanation of the documentation on the record that supported its claim

**NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED**

that Bancolor and Madrid DC provided higher intensity services to their small customers.  See
Case Br. at 32-40 (P.R. 120-122).  Commerce provided little or no explanation for disregarding
this evidence.  See Final I&D Mem. at 17 (P.R. 134).  Commerce's failure to provide a "reasonably
discernable" explanation for disregarding this evidence thereby rendered its determination that
only one LOT existed in Baux's home market as unsupported by substantial evidence and
otherwise not in accordance with law.  NMB, 557 F.3d at 1319.

For Channel 1 sales corresponding to LOT 1, Baux factory-direct sales to the United States,
Baux reported "No" for small customer support in its Revised Exhibit A-19.  See Case Br. at 33
(P.R. 120-122).  For other channels, including all channels other than Baux factory-direct sales,
Baux reported "Yes" for small customer support at varying degrees ranging from a low of [ ■ ]
for some sales from Bancolor up to a [ ■ ] for Madrid DC sales that involved additional
processing. See Supp. Sec. A Resp. at Ex. A-19 (revised) (C.R. 62).  [ ■ ] is the highest intensity
Baux reported for any selling function.  Compared with "No" for Baux factory-direct sales,
therefore, there could not be a starker difference in the selling functions (or lack thereof) performed
to small customers.

No "reasonable mind," Huayin, 322 F.3d at 1374, could find that Commerce sufficiently
supported its conclusion that "Baux does not point to any record evidence showing that the
customer support it provided actually differed between the claimed LOTs (as required by the
SAA)."  Final I&D Mem. at 17 (P.R. 134).  In its case brief, Baux provided a detailed explanation
of the documentation on the record that supported these designations for the customer support
services performed in the claimed LOTs.  See Case Br. at 32-40 (P.R. 120-122).  Specifically,
Baux noted that the record confirmed that Baux did not have any small customers given that
Commerce verified that [ ■■■■ ] of Baux's sales during the POR were to one customer,

Baux's affiliate Bancolor.  See Verif. Exhibits at Ex V-6 (C.R. 138-144) (showing total "Venta PTO: Terminado Bancolor" of [ ███████████████████████████████████ ███ ]).  Baux's home market database further confirmed Baux's remaining customers.  See Case Br. at 34-35 (C.R. 146-148) (detailing how by filtering Baux's home market database demonstrates that it only has [ █ ] customers other than Bancolor, Bancolor had [ ██ ] customers and Madrid DC had [ ███ ] customers).  Baux then provided a detailed chart and explanation of how its home market database establishes that as compared to Baux's [ █ ] factory-direct Spanish customers, Madrid DC's [ ██ ] Spanish customers are much smaller in terms of [ ██████ ] of orders. See id. at 35-36.  Additionally, a cursory analysis of Baux's reported home market sales database shows that Baux had [ ███ ] invoices for less than 1 MT of CAAS during the POR, whereas Bancolor registered [ ██ ] such invoices and Madrid DC recorded [ ██ ] such invoices during the period of review.  See Secs. B-C Resp. at Ex. B-1 (C.R. 14-34) (counting the number of invoices for each selling entity containing less than 1 MT).  Commerce also verified that Madrid DC operated under distinct conditions regarding the awarding of customer rebates than do Baux and Bancolor.  Sales Verif. Rep. at 12 (P.R. 115).  Commerce's conclusion that Baux failed to support the differences in customer support provided by Madrid DC "beyond a causal relationship," Final I&D Mem. at 17 n. 78 (P.R. 134), is nonsensical when considering Baux's verified database confirms the number of customers for each entity as reported by Baux.  Baux's home market database confirms the simple reality that Baux had no small customers at all, while the Commerce-verified home market sales database confirms that relative to Baux's customers, the Madrid DC customers were much smaller by any and every measure.  By any test, where Commerce itself has identified "small customer support" as a selling function, the absence of any small customers in

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

Baux's factory-direct sales channel eliminates the possibility that Baux could perform any such

support.

Further, Commerce's conclusion that Baux failed to explain "how the customer support it

provided was <u>materially</u> different" among the three LOTs that Baux identified home market was

not supported by substantial evidence on the record. Final I&D Mem. at 17 (P.R. 134) (emphasis

added). In its case brief, Baux explained that:

> Madrid DC had a large number of customers and their respective small quantity of
> purchases of a very diverse product array means that the Madrid DC operates very
> much like a grocery store, stocking many items and meeting individual customers
> requirements with customized products. One such requirement of small customers
> is to sometimes have available individual sheets (pieces) of aluminum, as opposed
> to giant rolls.

Case Br. at 36 (P.R. 120-122). Baux's verification exhibits included invoices showing that Madrid

DC made several sales of individuals sheets. <u>See</u> <u>id.</u> at 37 (C.R. 146-148) (including a sample

invoice); <u>see also</u> Supp. Secs. A-C Resp. Part I at 2 (C.R. 114-116) (explaining that Madrid DC

can include sales "on a unit basis when the customer requests non-standard merchandise, including

blanks"); <u>id.</u> at Ex. 2SB-2 (showing invoice for sale of goods [ ███████████████████████████

█████████████ ]). Commerce's finding that it is not apparent "that the sale of individual

sheets constitutes evidence of additional or different selling functions" misses the mark. Final

I&D Mem. at 17, n. 77 (P.R. 134). Madrid DC must be offering different services given that its

customers are smaller than Baux's customers. Baux does not sell individual units to customers

and does not sell non-standard merchandise such as blanks. Commerce cannot lawfully expect

Baux to demonstrate "substantial" differences in selling activities when factory direct sales from

Baux are not made to small customers in the first instance.

Finally, Commerce outright ignored record evidence demonstrating that substantial

differences in selling activities – i.e., that Madrid DC offered particular services to its customers

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

at greater intensities than even Bancolor – detracting from its preferred conclusion that only one LOT existed in the home market.  See id.  While Baux sold only uncoated CAAS coils, Bancolor and Madrid DC engaged in further processing in support of their different customer bases who required a variety of non-mechanical surface finishes beyond the uncoated coils sold by Baux.  See Case Br. at 38 (P.R. 120-122). Madrid DC offered further services to its small customers beyond those provided by Bancolor.  See id.  To support its small customers, Madrid DC sold painted products that were painted after the first sale by Baux, and further slit, cut, powder-coated, panel-sandwiched depending on what the diversity of small customers required.  See id. at 39 (P.R. 120-122).  As Baux emphasized in its case brief to Commerce:

> Baux's verified home market sales database confirms that Baux only sold product with NMSURFH = [ ▮▮▮▮▮▮▮▮ ], the Madrid DC also sold powder coated and painted products, coded in the database with [ ▮▮▮▮▮▮ ] respectively.  See {Supp. Secs. A-C Resp. at Ex. 2SB-1 {(C.R. 114-116)}.  Only [ ▮▮▮ ] of the Madrid DC's nearly [ ▮▮▮▮▮ ] sales observations were for sales of uncoated products, meaning [ ▮ ] percent of the Madrid DC's customers – already confirmed as "small" – required support by arranging additional surface processing not offered by Baux on its factory-direct sales to large customers.  Given that the Madrid DC had a significant number of small orders, and these orders represented a diverse product, the Madrid DC by necessity had to expend significantly more customer support to meet these orders.

Case Br. at 38 (C.R. 146-148).  At no point in the Final Results does Commerce discuss these unique activities performed by Madrid DC and instead merely concludes that "Baux captured the expenses associated with those activities in its reported manufacturing costs . . . and {Commerce} accounted from them as part of the DIFMER adjustment."  Final I&D Mem. at 17, n. 74 (P.R. 134).  Commerce's conclusion ignored that its mandate to move reported external fabrication expenses from Baux's reported sales into the reported costs prevented an adequate price comparison by forcing similar CONNUMs to be treated identically from a pricing perspective regardless of whether those processing steps were performed by Baux or by a third party.

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

Commerce's failure to properly address this evidence that "fairly detract{ed}" from the weight of its conclusion warrants a remand alone.  See Changzhou Trina, 975 F.3d at 1326.  Regardless, the only reasonable reading of the record is that Madrid DC performed unique customer services thereby establishing a different LOT from Baux's factory direct sales.

For these reasons, the only reasonable reading of the record is that Bancolor and Madrid DC either performed customer support functions that were not performed by Baux or Madrid DC preformed these functions at a higher level of intensity than Baux and Bancolor.  The existence of these differing sales functions in certain sales channels and not others in the home market thereby rendered Commerce's determination that only one LOT existed in Baux's home market as unsupported by substantial evidence and otherwise not in accordance with law.

> iv.  *Baux Provided Commissions in Certain Sales Channels in the Home Market But Not Others*

The only reasonable reading of the record is that Baux performed different selling functions concerning commissions in certain sales channels in the home market but not others.  Commerce unlawfully ignored this evidence and instead merely concluded that it had already accounted for such differences in its AD margin calculation.  See Final I&D Mem. at 17 (P.R. 134).  Contrary to Commerce's conclusion, a LOT adjustment was necessary to ensure a fair comparison between NV and the EP.

Substantial evidence on the record demonstrates that different selling functions occurred in different sales channels in the home market because Baux's affiliates performed commissions at LOT 3 but no other LOT in Baux's home market.  Commerce identified "Commission Payments" as a selling function to be identified in the selling functions chart.  See AD Q'naire at A-15 (P.R. 16-17).  Baux reported that, at the more remote stage of marketing for Madrid DC customers, LOT 3, [██████████████████████████████████ ].  See Supp. Sec.

A Resp. at Ex. A-19 (revised) (C.R. 62).  Baux and Bancolor did not pay commissions at LOT 1 or LOT 2.  See id.  Baux explained that Madrid DC utilized this [ ███████████████████ ███████████████████████████████████████████████████████████████ ████████████████ ].  Secs. B-C Resp. at B-38 (C.R. 14-34).  To make its resales of the Baux/Bancolor product, the selling functions required to reach far-away customers at a more remote stage of marketing were even more intense than could be served by Madrid DC internal sales personnel.  The record, thus, contains substantial evidence demonstrating that Madrid DC performed a selling function in the form of commissions that was not performed by Baux or Bancolor.

Commerce's finding that its AD margin calculation already adjusts for the performance of the above-detailed selling functions in different sales channels is flawed.  See Final I&D Mem. at 17 (P.R. 134).  The problem is not hypothetical as the record confirms that some selling functions are not properly captured by sales adjustments despite Commerce's finding to the contrary.  Based on methodological decisions by Commerce, these items are not reflected in the reported prices for these products in any way, however, Commerce itself noted the distinctions between the products being sold and the differences manifested in these products must naturally result in a difference in price.

For these reasons, Commerce failed to consider evidence that "fairly detract{ed}" from the weight of its conclusion that there was only one LOT in Baux's home market given that the record established that Baux performed commissions in certain sales channels in the home market but not others.  See Changzhou Trina, 975 F.3d at 1326.  Commerce's conclusion that it already accounted for these differences in other portions of its AD margin was not supported by substantial evidence because Commerce's choice to treat an expense specific to Madrid DC sales as a cost assigned to

CONNUMs sold in all LOTs distorts price comparability thereby requiring a LOT adjustment to achieve a fair comparison price.

### v. The Performance of Different Selling Functions in the Home Market Demonstrated the Existence of Three Distinct LOTs

In sum, Commerce's conclusion that only one LOT existed in Baux's home market was not supported by substantial evidence and was otherwise not in accordance with law.  Commerce's past practice confirms that the performance of different selling functions is sufficient to establish the existence of different LOTs.  Baux proved that it performed different selling activities thereby establishing different LOTs in the home market based on selling functions that Commerce itself defined for this analysis.   As discussed at length above, Madrid DC's selling functions at LOT 3 included (1) warehousing (logistical services), (2) small customer support and (3) commissions, none of which were performed at all at LOT 1.   Important selling functions identified by Commerce performed at one stage of marketing, and not at another, by any measure are the very definition of a difference in level of trade.  By matching Baux's LOT 1 sales to the United States to Madrid DC LOT 3 sales, without any consideration of LOT differences, Commerce failed in its statutory mandate to make a fair comparison.

### C. Substantial Evidence Established Selling Functions that Differ by Degree of Intensity in Baux's Home Market

Commerce unlawfully concluded that Baux failed to "provide supporting documentation that clearly substantiated the reported intensity levels" of the different selling functions performed in the home market.  Final I&D Mem. at 13 (P.R. 134) (citation omitted).   Where Baux has shown how the record, including elements verified by Commerce, confirms that Baux and its affiliates performed Commerce-identified selling functions in certain home market LOTs but not others, a difference in LOT exists and it is unnecessary to further examine selling functions performed at

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

all levels but at different intensities.   It is unreasonable for Commerce to require more "documentation" of activity that did not occur.   Nevertheless, the only reasonable reading of the record is that Baux or its affiliates performed selling functions common to the home market LOTs at different levels of intensities.   Commerce failed to provide sufficient reasoning for treating the facts in this case differently than a prior determination where it found similar evidence to be sufficient to establish the existence of different LOTs.

Baux performed various selling functions common to all LOTs at different intensity designations.   For example, Baux reported a level [ █ ] intensity for "payment collection" while Bancolor and Madrid DC both reported [ █ ].   See Supp. Sec. A Resp. at Ex. A-19 (revised) (C.R. 62).   Baux's database confirms that all Baux made all of its sales in the home market at LOT 1 with the identical payment term of [ ███ ] which requires payment [ ██████ ].   See Secs. B-C Resp. at Ex. B-7 (C.R. 14-34).   Both Bancolor and Madrid DC had many more individual payment terms, necessarily requiring more time to track and process payments.   See id. (showing [ █ ] separate possible payment terms for Bancolor customers and [ █ ] different payment terms for Madrid DC customers). The only reasonable reading of the record is that Baux and its affiliates performed selling functions common to the home market LOTs at different levels of intensity.

Commerce wrongly concluded that Baux "failed to substantiate its intensity designations for its selling functions."  Final I&D Mem. at 14 (P.R. 134).  In essence, Commerce faulted Baux for not supplying sufficient quantitative evidence in support of its intensity designations.  See id. In determining whether there are different selling activities, the focus of Commerce's analysis is on "selling activities and not on expenses."  Alloy Piping Prods. v. United States, 33 CIT 349, 357 (2009).  "{T}hough expenses alone may not accurately represent the number of selling activities associated with each {LOT}, Commerce may certainly analyze expenses to measure the frequency

of various selling activities."  Id.  Given that Commerce analyzes both selling activities and their

associated expenses, Commerce relies on both qualitative and quantitative data in determining the

existence of any differences in the levels of trade.  See Prelim. Dec. Mem. at 9 (P.R. 97).  The

record demonstrates that Baux essentially replicated the quantitative analysis that Commerce

found sufficient in its prior investigation of Circular Welded Carbon-Quality Steel Pipe from the

United Arab Emirates to demonstrate clear differences in the intensities of the distinct selling

functions performed at each LOT in the home market.  See Circular Welded Carbon-Quality Steel

Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review;

2017- 2018, 85 Fed. Reg. 77,159 (Dec. 1, 2020).

The court has previously rejected an attempt by Commerce to deny a LOT adjustment

based on Commerce's finding that a respondent failed to provide sufficient quantitative evidence

to support the existence of differences in LOTs.  See Universal Tube & Plastic Indus. v. United

States, __ CIT__, 586 F. Supp. 3d 1312 (2022).  In Universal Tube, the court remanded

Commerce's finding that all of a respondent's home market sales occurred in a single LOT,

concluding that Commerce failed to "address the record evidence on the whole" and that

Commerce's conclusions failed to properly consider "whether a level-of-trade adjustment (or CEP

offset) was required to achieve 'fair comparison' between CEP and normal value."  Universal

Tube, __ CIT at __, 586 F. Supp. 3dd at 1324-25.  On remand, Commerce reconsidered Universal

Tube's quantitative analysis, relying principally on the below chart that was a "sampling" of the

quantitative metrics provided by Universal Tube:

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

| Quantitative Metric | | Universal Producers | Affiliated HM Resellers | |
|---|---|---|---|---|
| Number of Invoices | [ | | | ] |
| Number of Reported HM Sales Observations | [ | | | ] |
| Number of Reported HM Sales Observations per Invoice | [ | | | ] |
| Metric Tons per Invoice | [ | | | ] |
| Invoices per Day | [ | | | ] |

Supp. Secs. A-C Resp. Part II at Ex. 2SC-2 (P.R. 84-92) (attaching Final Results of Redetermination Pursuant to Court Remand at 13 (Oct. 13, 2022) (Public Version), Universal Tube & Plastic Indus. v. United States, No. 20-03944, ECF No. 58). Commerce found that these quantitative metrics "corroborate Universal's qualitative reporting in showing that the affiliated HM resellers typically had to perform more selling activities at a greater intensity and frequency." Id. Based on this information, Commerce found that different LOTs existed in Universal Tube's home market. See id.

In finding that "the Universal Final Remand is {not} on point," Final I&D Mem. at 18 (P.R. 134), Commerce provided "insufficient reasons," treating the facts in this appeal differently than its remand redetermination in Universal Tube given that Baux submitted sufficient quantitative evidence to demonstrate that Bancolor and Madrid DC had to perform more selling activities at a greater intensity and frequency. NMB, 557 F.3d at 1319. In its case brief, Baux detailed how it essentially replicated the information contained in the above table that Commerce found was sufficient to establish the existence of multiple LOTs in its remand redetermination in Universal Tube. See Case Br. at 46 (P.R. 120-122) (performing calculations to show the number of invoices per day in each LOT identified by Baux). Baux's calculation demonstrated a

[ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ ]. See id. at 46-47 (C.R. 146-148). Commerce acknowledged that "Baux did

attempt to replicate some of the information Universal submitted" but ultimately found "Baux failed to provide . . . the same level of quantitative evidence in supports of its qualitative reporting as Universal did."  Final I&D Mem. at 18 (P.R. 134).  Buried in a footnote in its final results memorandum, Commerce faulted Baux for allegedly only showing "that prices vary by seller without identifying the reason behind these differences."  Id. at n. 85.  In other words, Commerce faulted Baux for not demonstrating that the differences in LOTs affected price comparability.  Commerce's conclusion was not supported by substantial evidence on the record.

In in its Section A-C supplemental questionnaire response, Baux showed the average prices at the three LOTs, which correlate to the "additional selling functions/activities" undertaken by Baux's affiliated HM resellers:

| Row Labels | Average of GRSUPRH (EUR/KG) |
|---|---|
| LOT 1 | [   ] |
| LOT 2 | [ ▮ ] |
| LOT 3 | [   ] |

Supp. Secs. A-C Resp. Part II at 11 (C.R. 117-125).  In its case brief before Commerce, Baux then put the above prices and corresponding selling expense ratios on the same chart to illustrate how "{t}he pricing at the different home market levels of trade correlates to the differing selling expenses associated with the different and more intense selling functions where Baux's affiliates resold the CAAS to unrelated customers at different stages of marketing."  Case Br. at 50 (C.R. 146-148).  Baux reproduces this chart below for ease of reference:

[



]. Id.  Indeed, Madrid DC explained that it "did not base the sales price to the customer on the pricing formula used in the normal course of business by Baux," meaning that Madrid DC necessarily engaged in negotiations and pricing discussions of a different nature than those of Baux and Bancolor.  See Suppl. Secs. B-C Resp. at 6 (P.R. 73); see also Sec. A Resp. at A-17 (C.R. 5-12) (noting that Madrid DC [                                                     ]).  The only reasonable reading of the record, thus, is that Baux established the different LOTs affected price comparability.

For these reasons, Commerce's finding that Baux failed to establish a difference in the level of intensities of the selling functions performed at different LOTs in the home market, and then how these differences impacted price comparability, was not supported by substantial evidence and was otherwise not in accordance with law.

## CONCLUSION

The Court should grant this Rule 56.2 Motion for Judgment on the Agency Record because Commerce unreasonably interpreted its statutory mandate and its actions as described above were not supported by substantial evidence or otherwise not in accordance with law.  Accordingly, the Court should remand the Final Results to Commerce for a determination in accordance with the points of fact and law discussed above.


                                                    Respectfully submitted,

Dated: June 11, 2024                                /s/ Jeffrey S. Grimson
                                                    Jeffrey S. Grimson
                                                    Kristin H. Mowry
                                                    Bryan P. Cenko
                                                    *Counsel to Compañia Valenciana de*
                                                    *Aluminio Baux, S.L.U. and Bancolor Baux*
                                                    *S.L.U.*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and the Scheduling Order to this case. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,836 words.

Dated: June 11, 2024

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Compañia Valenciana de Aluminio Baux, S.L.U. and Bancolor Baux S.L.U.*