**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | | |
|---|---|---|
| COMPANIA VALENCIANA DE ALUMINIO BAUX, S.L.U. and BANCOLOR BAUX, S.L.U., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | Court No.  23-00259 |
| Defendant, | ) ) | PUBLIC VERSION |
| and | ) ) | Business Proprietary Information Denoted by |
| ALUMINIUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, | ) ) ) | Brackets [ ] on Page(s) 32 |
| Defendant-Intervenor. | ) ) ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

KYLE S. BECKRICH
Trial Attorney
CHRISTOPHER KIMURA
Attorney
U.S. Dept. of Justice
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.
Civil Division/National Courts
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

September 9, 2024

Attorneys for Defendant

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

STATEMENT PURSUANT TO RULE 56.2 .................................................................2

    I.    Administrative Determination Under Review .......................................................2

    II.    Issues Presented For Review ...........................................................................2

STATEMENT OF FACTS ...................................................................................2

    I.    Preliminary Results ......................................................................................3

    II.    Final Results ............................................................................................6

SUMMARY OF THE ARGUMENT .......................................................................10

ARGUMENT ...............................................................................................11

    I.    Standard Of Review .....................................................................................11

    II.    19 C.F.R. § 351.412(c) Is In Accordance With Law ...........................................13

        A.    Legal Framework ...............................................................................13

        B.    Commerce's Regulation Is Consistent With The Statute And The SAA ...14

            1.    Baux's Arguments Improperly Rely On *Chevron* .........................14

            2.    Commerce's Regulation Is Consistent With The Statute And The SAA .......................................................................................16

    III.    Commerce's Determination To Deny Baux A Level Of Trade Adjustment Is Supported By Substantial Evidence And In Accordance With Law ...................20

        A.    Legal Framework ...............................................................................20

        B.    Commerce's Denial Of A Level Of Trade Adjustment Is Supported By Substantial Evidence ...........................................................................22

            1.    Commerce's Determination With Respect To Baux's Affilliates' More-Remote Sales Is Supported By Substantial Evidence .........27

i

2. Commerce's Determination With Respect To Baux's Selling Functions Is Supported By Substantial Evidence ........................ 30

3. Commerce's Determination Regarding Baux's Levels of Intensity Designations Is Not Contrary To *Universal Tube* and Commerce Did Not "Verify" Baux's Reported LOT Claims ........................ 35

CONCLUSION .................................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Andaman Seafood Co., Ltd. v. United States,*
    768 F. Supp. 2d 1315 (Ct. Int'l Trade 2011) .......................................................................21

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................................ 12, 13, 35

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,*
    5 F.4th 1367 (Fed. Cir. 2021) ...............................................................................................15

*Changzou Trina Solar Energy Co. v. United States,*
    975 F.3d 1318 (Fed. Cir. 2020) .......................................................................................33, 34

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) .............................................................................................................11

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) .............................................................................................................12

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
    216 F.3d 1027 (Fed. Cir. 2000) ...........................................................................................15

*Florida Citrus Mut. v. United States,*
    550 F.3d 1105 (Fed. Cir. 2008) ...........................................................................................12

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................................................11, 15

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...................................................................12, 34

*Hyundai Steel Co. v. United States,*
    279 F.Supp. 3d, 1349 (Fed. Cir. 2017) ................................................................................29

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992) .........................................................................................................12, 34

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024) ........................................................................................................14

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984) ..............................................................................................11

*Micron Tech., Inc. v. United States,*
    117 F.3d 1386 (Fed. Cir. 1997) ............................................................................................13

iii

*Mitsubishi Elecs. Am., Inc. v. United* States,
  44 F.3d 973 (Fed. Cir. 1994) ..................................................................13

*Mitsubishi Heavy Indus., Ltd. v. United States*,
  275 F.3d 1056 (Fed. Cir. 2001) ..............................................................12

*Nan Ya Plastics Corp. Ltd. v. United States*,
  810 F.3d 1333 (Fed. Cir. 2016) ...............................................23, 36, 37

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ..............................................................12

*NSK Ltd. v. Koyo Seiko Co.*,
  190 F.3d 1321 (Fed. Cir. 1999) .......................................11, 22, 35, 36

*Pakfood Pub. Co. Ltd. v. United States*,
  724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ...............................13, 20

*Pasta Zara SpA v. United States*,
  35 CIT 620, 781 F. Supp. 2d 1297 (2011) ........................................9, 31

*Pasta Zara SpA v. United States*,
  703 F. Supp. 2d 1317 (2010) .............................................................9, 30

*Peer Bearing Co. v. United States*,
  587 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) .....................................30

*RHP Bearings Ltd. v. United States*,
  288 F.3d 1334 (Fed. Cir. 2002) ..............................................................14

*Smith-Corona Group v. United States*,
  713 F.2d 1568 (Fed. Cir. 1983) ..............................................................15

*Sucocitirico Cutrale Ltda. v. United States*,
  36 CIT 821 (2012) ....................................................................................23

*Thai Pineapple Pub. Co. v. United States*,
  187 F.3d 1362 (Fed. Cir. 1999) ..............................................................12

*Timken Co. v. United States*,
  699 F. Supp. 300 (Ct. Int'l Trade 1988) .................................12, 30, 34

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ..................................................................................12

*Universal Tube & Plastic Indus. v. United States*,
  586 F. Supp. 3d 1312 (Ct. Int'l Trade 2022) .....................................35

**Statutes**

19 U.S.C. § 1675 ..................................................................................................15

19 U.S.C. § 1677 ..................................................................................................10

19 U.S.C. § 1677b ...........................................................................................passim

19 U.S.C. § 3511 ..................................................................................................14

19 U.S.C. § 3512 ..................................................................................................14

**Regulations**

19 C.F.R. § 351.401 .........................................................................................11, 22

19 C.F.R. § 351.412 .......................................................................................passim

**Other Authorities**

*Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,371 (Dep't of Commerce June 18, 1997)..................................................................................passim

*Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16,363 (Dep't of Commerce April 4, 2017)...............26

*Certain Cold-Rolled Steel Flat Products from the United Kingdom: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 49,929 (Dep't of Commerce July 29, 2016)..................8

*Certain Oil Country Tubular Goods from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 Fed. Reg. 54,928 (Dep't of Commerce Oct. 5, 2021) .....................................22

*Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Notice Not To Revoke Antidumping Duty Order in Part*, 75 Fed. Reg. 50,999 (Dep't of Commerce Aug. 18, 2010) ..................................................................................21

*Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 38,847 (Dep't of Commerce June 29, 2020) ...................................................................................................9

*Stainless Steel Bar from Brazil: Preliminary Results of Antidumping Duty Administrative Review: 2013-2014*, 79 Fed. Reg. 75,789 (Dep't of Commerce Dec. 19, 2014) .......................8

*Strontium Chromate from France: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 66,652 (Dep't of Commerce Nov. 4, 2022)........................22

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| COMPANIA VALENCIANA DE ALUMINIO BAUX, S.L.U. and BANCOLOR BAUX, S.L.U., ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> UNITED STATES, ) <br><br> Defendant, ) <br><br> and ) <br><br> ALUMINIUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, ) <br><br> Defendant-Intervenor. ) | Court No.  23-00259 |

<u>**ORDER**</u>

Upon consideration of the motion for judgment upon the agency record, responses thereto, reply, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

Dated: _____, 2024        _____
         New York, NY                                          JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
                                                    )
COMPANIA VALENCIANA DE ALUMINIO                     )
BAUX, S.L.U. and BANCOLOR BAUX, S.L.U.,             )
                                                    )
            Plaintiffs,                             )
                                                    )
      v.                                            )
                                                    )
UNITED STATES,                                      )        Court No.  23-00259
                                                    )
            Defendant,                              )        PUBLIC VERSION
                                                    )
      and                                           )        Business Proprietary
                                                    )        Information Denoted by
ALUMINIUM ASSOCIATION TRADE                         )        Brackets [ ] on Page(s) 32
ENFORCEMENT WORKING GROUP,                          )
                                                    )
            Defendant-Intervenor.                   )
_____    )


**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'**
**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the

motion for judgment upon the agency record filed by plaintiffs Compañia Valenciana de

Aluminio Baux, S.L.U. and Bancolor Baux, S.L.U. (collectively Baux), challenging the final

results of the Department of Commerce's (Commerce) first administrative review of the

antidumping duty order covering common alloy aluminum sheet (CAAS) from Spain.  The Court

should deny plaintiffs' motion because Commerce's final results are supported by substantial

evidence and are otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.     Administrative Determination Under Review

Plaintiffs challenge *Common Alloy Aluminum Sheet From Spain: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76,722 (Dep't of Commerce Nov. 7, 2023) (*Final Results*) (P.R. 140), and accompanying issues and decision memorandum (IDM) (P.R. 134), covering the period of review (POR) from October 15, 2020, through March 31, 2022.[1]

### II.     Issues Presented For Review

1.     Whether Commerce's regulation with respect to establishing differences in the level of trade (LOT), specifically 19 C.F.R. § 351.412(c)(2), is in accordance with law?

2.     Whether Commerce's determination to deny Baux an LOT adjustment is supported by substantial evidence and in accordance with law?

### STATEMENT OF FACTS

On April 27, 2021, Commerce issued an antidumping order on CAAS from Spain following an affirmative antidumping determination and an affirmative injury determination by the International Trade Commission.  *See Common Alloy Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain Taiwan, and the Republic of Turkey; Antidumping Duty Orders*, 86 Fed. Reg. 22,139 (Dep't of Commerce Apr. 27, 2021).  On June 9, 2022, Commerce initiated the first administrative review of the antidumping duty order on CAAS, covering the POR from October 15, 2020, through March 31, 2022.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165 (Dep't of Commerce June 9, 2022) (P.R. 8).

---

[1]  "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

I.    **Preliminary Results**

On May 5, 2023, Commerce published its preliminary results of the review, finding that

Baux had made sales of CAAS at prices below normal value during the POR.  *See Common*

*Alloy Aluminum Sheet From Spain: Preliminary Results of Antidumping Duty Administrative*

*Review; 2020-2022*, 88 Fed. Reg. 29,090 (Dep't of Commerce May 5, 2023) (*Preliminary*

*Results*) (P.R. 103), and accompanying preliminary decision memorandum (PDM) (P.R. 97).

Relevant to this litigation, Baux reported that it sold CAAS through three distinct levels

of trade in the home market, based on differences in selling activities, customers' perceptions,

and pricing.  PDM at 10–12 (citing Compañia Valenciana de Aluminio Baux S.L.U.

Questionnaire Response at B-33 (Baux Questionnaire Response) (P.R. 40–42) (C.R. 14–31)).

The three reported levels of trade are (1) direct sales from Baux to unaffiliated customers (LOT

1), (2) downstream sales that Baux's affiliate Bancolor processed and sold to unaffiliated

customers (LOT 2), and (3) warehouse sales by Bancolor's Madrid DC to unaffiliated customers

(LOT 3).  PDM at 10-12.  Baux reported only one LOT in the U.S. market, consisting of sales

made directly from Baux to U.S. customers.  *Id.*

In the *Preliminary Results*, Commerce found that Baux failed to satisfy its burden of

proof in demonstrating that its home market sales during the POR were made at different levels

of trade.  *Id.* at 10–11.  Baux had three opportunities, including two supplemental questionnaires,

to submit information explaining the differences in the levels of trade in its home and U.S.

markets and Baux's ranking system, which measured the intensity levels in its home market.  *Id.*

(citing Baux Questionnaire Response at B-33; Initial AD Questionnaire at A-7–8 (Initial

Questionnaire) (P.R. 16–17); Section A Response at A-16 (P.R. 32) (C.R. 5); Supplemental

Section A Questionnaire at 3 (P.R. 54) (C.R. 49); Baux Supplemental Section A Response at 7

and Exhibit A-19 (Revised) (P.R. 59) (C.R. 62); Supplemental Questionnaire at 5–6 (P.R. 77) (C.R. 102)). Specifically, Commerce asked Baux to list the specific activities for each reported selling activity category, provide supporting documentation to substantiate each activity during the POR, and discuss how each reported activity is relevant to the LOT analysis. PDM at 10-12.

After receipt of Baux's first response, Commerce sought more information concerning Baux's LOT claims. *Id.* Initially, Baux submitted a chart listing its selling functions, stating that the chart's information "represents *an estimate* based on sales flows for individual channels, and {that} Baux intends to report a more precise breakdown of the selling expenses associated with each channel in its responses to the other sections of Commerce's questionnaire." *Id.* (citations omitted) (emphasis added). However, Baux's response did not describe the specific activities that it had performed for each selling activity or provide supporting documentation that can substantiate its reported intensity levels. *Id.*

Commerce asked Baux to "provide documentation and explanation regarding how the documentation provided supports each of the intensity levels {that Baux} reported for each selling function." *Id.* (citation omitted). Baux submitted a revised exhibit and some supporting documentation. *Id.* However, Baux provided no explanation as to how the new documentation substantiated its reported data, nor did it provide documentation for all the reported selling activities. *Id.* For instance, plaintiffs reported that Baux, Bancolor, and Madrid DC, performed various activities like sales forecasting, sales meetings, and customer sales support. However, to support its claimed selling activities, Baux (1) provided only one post-POR documentation of one customer for sales forecasting, (2) provided no qualitative analysis to explain discrepancies, such as why Baux sold CAAS in larger volumes but had lower intensities in sales forecasting than Bancolor, and (3) provided no other documentation for the other activities under this

category. *Id.* (citing Baux Supplemental Section A Response at SA-3, 6).  Likewise, Baux

claimed that Bancolor and Madrid DC issued more invoices and collected more payments than

Baux during the POR, but Baux failed to demonstrate that asserted fact or to explain how that

fact results in a corresponding increase in the intensity of associated administrative activities. *Id.*

at 11.

Therefore, for a third time, Commerce requested Baux to provide this information, but

Baux again failed to substantiate its claims. *Id.* at 10–11.  For example, Baux did not provide

support for its claim that training activities differed for Baux, Bancolor, and Madrid DC, based

on the products each sold. *Id.* at 11.  Baux (1) admitted that the level of intensity and the

frequency of training activities amongst the three entities were comparable, (2) provided a single

post-POR email exchange with a Bancolor customer, and (3) failed to provide any

documentation that can substantiate Baux's claim that higher-intensity training services for

Bancolor were warranted due to the high level of small customer support by Madrid DC. *Id.*

Commerce found that Baux's claim relating to its training activities is unsubstantiated.

*Id.* (citing Baux Supplemental Section A Response at SA-3 and observing that Baux provided no

other documentation to support "any other intensity levels reported for the other selling activities

under this selling function.").  Additionally, under the category of "Provision of Logistical

Services," Baux stated that it had more frequent inventory management discussions between it

and its customers, while Bancolor and Madrid DC had significantly more delivery arrangements

and warehousing activities, including cutting and repacking services. *Id*. at 11.  However, to

support its claims regarding activities during the POR, Baux provided only one post-POR email

exchange with a Baux customer, and it did not explain the relevancy of certain activities to the

LOT analysis, given that Bancolor's cutting costs and repacking were already captured in Baux's

reported home market direct selling expenses.  *Id.* (citing Baux Supplemental Section A

Response at SA-3).  Upon reviewing the total record evidence, Commerce found that Baux did

not provide sufficient qualitative and quantitative evidence that could substantiate Baux's

reported selling functions or the intensity levels at which they were performed.  *Id*. at 11.

## II.    <u>Final Results</u>

Interested parties, including Baux and the Aluminum Association Trade Enforcement

Working Group (petitioner and defendant-intervenor), submitted case briefs following the

issuance of the *Preliminary Results*.  Commerce also conducted verification of Baux's submitted

information and issued a Verification Report and the record of the corresponding exhibits on July

7, 2023, and August 3, 2023, respectively.  *See* Memorandum from the Department re:

Verification of the Questionnaire Responses of Campania Valenciana de Aluminio Baux,

S.L.U./Bancolor Baux S.L.U. in the Administrative Review of the Antidumping Duty Order on

Common Alloy Aluminum Sheet from Spain (Verification Report) (P.R. 115) (C.R. 145); Letter

to Sec'y of Commerce from Mowry & Grimson re: Common Alloy Aluminum Sheet from

Spain: Verification Exhibits (Verification Exhibits) (P.R. 114) (C.R. 138–143).  As part of

verification, Commerce conducted at least four traces of sales, three of which took place in the

home market.  Verification Report at 11–12.  On November 7, 2023, Commerce published the

*Final Results* and addressed plaintiffs' and defendant-intervenor's arguments raised in their

administrative case briefs.  *See Final Results*, and accompanying IDM; Baux's Admin Br. (P.R.

120–22) (C.R. 146–48); Petitioner Rebuttal Br. (P.R. 126) (C.R. 149).

In the *Final Results*, Commerce continued to find that Baux sold CAAS in the home

market at one LOT and, therefore, an LOT adjustment was not warranted.  IDM at 8, 12–19.

Specifically, Commerce found that Baux's support for its requested LOT adjustment was

insufficient because Baux failed to substantiate its intensity designations for its selling functions with sufficient qualitative and quantitative record evidence, despite multiple explicit requests by Commerce. *Id.* at 14 (citing Baux Supplemental Section A Response at 7–10 and Baux Supplemental Section A-C Questionnaire Response Part II – Questions 1-7 & 10-15 at 4–12 (P.R. 84–92) (C.R. 117–25)).

Commerce addressed Baux's arguments in the IDM. For instance, Baux argued that its intensity levels were valid because plaintiffs each had different payment terms that accrued additional process efforts, thereby "amply support{ing}" intensity levels. *Id.* (citing Baux Admin. Br. at 44). Commerce rejected this claim, explaining that it found no record evidence showing that plaintiffs had actually performed the different functions or showing how the payment terms related to its home market sales database or to actual actions taken by plaintiffs' administrative staff. *Id.*

Baux also argued that because Bancolor and Madrid are more remote from Baux, multiple levels of trade are self-evident as indicated under the *Preamble* to Commerce's regulations. *Id.* at 14–15 (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,371 (June 18, 1997) (*Preamble*) ("{It} is sufficient that, at the more remote level, the seller takes on a role comparable to that of a reseller if the merchandise had changed hands twice . . . .")). Commerce explained that Baux's interpretation conflicts with the *Preamble* and Commerce's regulation 19 C.F.R. § 351.412(c), which requires Commerce to find substantial differences in selling activities when determining differences in levels of trade. IDM at 14–15. Commerce explained that the *Preamble* requires that remote sales from the factory *must* involve an additional layer of selling activities and requires that such activities *must* collectively amount to a *substantially* different selling function, and Commerce's practice is to

undertake such LOT analysis as a matter of course.  Commerce also recognized that the

*Preamble*, contrary to Baux's interpretation, does not say that such analysis concerning levels of

selling activities and substantial differences in selling functions is unnecessary.  *Id*.

Commerce also rejected Baux's argument that it is sufficient to show that plaintiffs each

performed a few different selling activities, each of whom performed a slightly different mix of

functions.  *Id.* at 16.  Commerce explained that under the Statement of Administrative Action,

H.R. Doc. No. 103-316 (1994) (SAA), Commerce may consider only the expenses associated

with those activities to the extent that they differ from those reported elsewhere in a company's

response.  *Id.* at 16–17 (citation omitted).  Many of Baux's reported activities like warehousing,

small customer support, logistical services, and commissions, were not pertinent to the LOT

analysis because, among other things, Commerce had already adjusted Baux's home market

prices for those activities, or Baux failed to provide an adequate narrative record that would

explain what "small customer support" entailed or identify what associated expenses were

included under "small customer support."  *Id.*

In addition, Commerce rejected Baux's claims that Commerce should have reached the

same result as in past cases.  *Id.* at 15–19.  Commerce explained that, even if Commerce were to

follow those cases, that would not have led to a different conclusion because Commerce

performed the same analysis in this case, the difference between the cases being that, unlike

Baux, the respondents in those cases passed the regulatory test to find the existence of multiple

levels of trade.  *Id.* at 15–16 (citing *Certain Cold-Rolled Steel Flat Products from the United*

*Kingdom: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 49,929 (Dep't of

Commerce July 29, 2016) (*CRS from the UK*), and accompanying IDM at Comment 1; *Stainless*

*Steel Bar from Brazil: Preliminary Results of Antidumping Duty Administrative Review: 2013-*

*2014*, 79 Fed. Reg. 75,789 (Dep't of Commerce Dec. 19, 2014) (*SS Bar from Brazil*), and

accompanying PDM at 8).

Commerce also addressed Baux's argument that its quantitative analysis is similar to the

one deemed sufficient in *Universal Final Remand.  Id.* at 18–19 (citing *Final Results of*

*Redetermination Pursuant to Court Remand, Universal Tube and Plastic Indus., Ltd. v. United*

*States*, Consol. Court No. 20-03944, Slip Op. 22-83 (July 15, 2022) (*Universal Final Remand*),

available at https://access.trade.gov/resources/remands/22-83.pdf).  Commerce found that Baux's

quantitative record evidence had analytical deficiencies that made *Universal Final Remand*'s

quantitative analysis inapposite with Baux's.  *Id.* (observing that Baux "failed to provide

sufficient qualitative evidence or the same level of quantitative reporting as Universal did").

Commerce also disagreed with Baux that either *ESBR from Brazil* or *Pasta Zara I* stands

for the proposition that whenever a selling function (not activity) is different, then there exists by

definition a difference in levels of trade.  *Id.* at 15–16 (citing *Emulsion Styrene-Butadiene*

*Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85

Fed. Reg. 38,847 (Dep't of Commerce June 29, 2020) (*ESBR from Brazil*) and *Pasta Zara SpA v.*

*United States*, 703 F. Supp. 2d 1317 (2010) (*Pasta Zara I*)).  Commerce explained that in *Pasta*

*Zara II*, the Court affirmed that the existence of different selling activities is not sufficient to

demonstrate that different levels of trade exist.  *Id.* (citing *Pasta Zara SpA v. United States*, 35

CIT 620, 781 F. Supp. 2d 1297 (2011) (*Pasta Zara II*) (reasoning that (1) Commerce's regulation

states that selling activities must be substantially different for a separate LOT, but some overlap

will not preclude such a determination, and (2) the *Preamble* does not require a different LOT

for every entity that took on the role as a reseller)).

Ultimately, Commerce continued to find that Baux failed to satisfy its burden of proof and did not grant an LOT adjustment. Therefore, Commerce continued to find that Baux sold CAAS in the home market at one LOT.

## SUMMARY OF THE ARGUMENT

Commerce's *Final Results* should be sustained. First, 19 C.F.R. § 351.412(c) is in accordance with law. Baux claims that Commerce's regulation is unlawful because it requires "substantial differences" in selling activities for finding that sales are made at different levels of trade when 19 U.S.C. § 1677b(a)(7)(A) requires mere "performance of different selling activities" to constitute multiple LOTs. However, Baux misconstrues the statute.

The statute, 19 U.S.C. § 1677b(a)(7)(A) does not explain what facts may support a finding that sales are made at different levels of trade. Rather, the provision applies only if Commerce first finds that the U.S. LOT differs from one or more levels of trade in the comparison (in this case, home) markets. This statute does not require Commerce to define an LOT when there are "any differences" in selling activities; the statute provides how to account for these differences if Commerce finds that multiple levels of trade exist.

Similarly, 19 U.S.C. § 1677, which sets forth "Definitions; Special Rules," does not define the term "level of trade" or specify which sales (or groups of sales) constitute an LOT or how to scrutinize the differences in selling activities. The statute uses the term "level of trade" as a concept distinct from selling activities. For example, Commerce could find different levels of trade even when there is an overlap in selling activities. *See Preamble*, 62 Fed. Reg. at 27,296 (citing SAA at 829). Accordingly, Commerce promulgated 19 C.F.R. § 351.412(c)(2) to provide that differences in levels of trade exist when there is a "substantial difference" in selling

activities. This regulation is consistent with both the Tariff Act of 1930, as amended (the Act),

and the SAA, and therefore, it is lawful.

Second, Commerce's finding that Baux sold CAAS at one LOT in the home market is

supported by substantial evidence and in accordance with law. Commerce has a statutory

obligation to calculate normal value based on home market sales at the same LOT, "to the extent

practicable." 19 U.S.C. § 1677b(a)(1)(B)(i). Baux, who seeks a LOT adjustment by claiming

multiple home market levels of trade, has the burden to demonstrate the existence and

appropriateness of the claimed adjustment. 19 C.F.R. § 351.401(b)(1); SAA at 829; *NSK Ltd. v.*

*Koyo Seiko Co.*, 190 F.3d 1321, 1330 (Fed. Cir. 1999) (*Koyo Seiko Co.*). Baux failed to support

its levels of trade claims with sufficient qualitative and quantitative record evidence. IDM at 9,

12–19. Commerce has already addressed Baux's claims, among others, as to warehousing,

commissions, small customer support, and determined that an LOT adjustment is not warranted.

*Id.* Therefore, Commerce's findings in the *Final Results* are supported by substantial evidence

and in accordance with law. This Court should sustain Commerce's determination.

## ARGUMENT

## I.    Standard Of Review

In reviewing Commerce's antidumping determinations, this Court sustains "'any

determination, finding, or conclusion found' by Commerce unless it is 'unsupported by

substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen.*

*Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (citing 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" is "more than a mere scintilla" of relevant and reasonable evidence,

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Matsushita*

*Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

Even if two inconsistent conclusions from the record can be possible, this "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he court may not substitute its judgement for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." (citation and quotations marks omitted)); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988), *aff'd*, 894 F.2d 385 (Fed. Cir. 1990).

Therefore, "{a} party challenging Commerce's determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)). When Congress has entrusted an agency to administer a statute in fact intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992) (*INS*). The Federal Circuit has underscored that "Commerce is the 'master of the antidumping law.'" *Florida Citrus Mut. v. United States*, 550 F.3d 1105, 1111 (Fed. Cir. 2008) (citing *Thai Pineapple Pub. Co. v. United*

*States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999)); *Mitsubishi Elecs. Am., Inc. v. United* States, 44 F.3d 973, 976 (Fed. Cir. 1994); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394 (Fed. Cir. 1997). Hence, the Court will affirm Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions. *Atl. Sugar,* 744 F.2d at 1562.

## II.    19 C.F.R. § 351.412(c) Is In Accordance With Law

### A.    Legal Framework

In order to compare normal value to the appropriate U.S. price, Commerce is required to establish normal value "to the extent practicable, at the same {LOT} as" the export price (EP) or constructed export price (CEP). *Pakfood Pub. Co. Ltd. v. United States*, 724 F. Supp. 2d 1327, 1338 (Ct. Int'l Trade 2010) (*Pakfood Pub.*); *see also* 19 U.S.C. § 1677b(a)(1)(B). Normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same {LOT} as the {EP} or {CEP}." 19 U.S.C. § 1677b(a)(1)(B); *see also Micron Tech.*, 243 F.3d at 1304–05.

Commerce will increase or decrease the normal value–known as an offset or adjustment– to account for different levels of trade "if the difference in the {LOT} (i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade . . . ." 19 U.S.C. § 1677b(a)(7)(A); 19 C.F.R. § 351.412(b).

Commerce's regulations stipulate that "{Commerce} will determine that sales are made at different {levels of trade} if they are made at different marketing stages . . . . Substantial

differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing. . . ."  19 C.F.R. § 351.412(c)(2).

The SAA was adopted by Congress pursuant to Uruguay Round Agreements Act (URAA).  *See* SAA; *see also* 19 U.S.C. § 3511(a) (approving the SAA).  The SAA is "an authoritative expression" of congressional intent in adopting the URAA.  SAA at 656; *see also RHP Bearings*, 288 F.3d at 1345 n.7 (citing 19 U.S.C. § 3512(d)) ("{The SAA} shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the Tariff Act of 1930} in any judicial proceeding in which a question arises concerning such interpretation or application."); *see also Micron Tech.*, 243 F.3d at 1309 ("The SAA, of course, is more than mere legislative history. Congress has instructed that '{the SAA} approved by the Congress under {19 U.S.C. § 3511(a)} shall be regarded as an authoritative expression by the United States concerning the interpretation and application of . . . this Act in any judicial proceeding in which a question arises concerning such interpretation or application.' 19 U.S.C. § 3512(d).").  The SAA states that "it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in {the} Statement."  SAA at 656.

    **B.**    **Commerce's Regulation Is Consistent With The Statute And The SAA**

        1.    Baux's Arguments Improperly Rely On *Chevron*

Baux contends that, contrary the requirements of 19 U.S.C. § 1677b, Commerce improperly inserted a level of intensity framework into the LOT analysis.  Baux Br. at 13–21. Specifically, Baux argues that Commerce's regulation is unlawful under Step 2 of the *Chevron* analysis.  *Id.*  However, *Chevron* Step 2 was recently overturned and, therefore, the Court should not rely on *Chevron*.  *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

Although *Loper Bright* overruled *Chevron* Step 2 as applied to agency interpretations of

silent or ambiguous statutes under the APA, it did not disturb the Federal Circuit's longstanding

recognition that Commerce's determinations in antidumping and countervailing duty matters are

entitled to deference *distinct* from *Chevron*, due to their complex and technical nature.  *Borusan*

*Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75

(Fed. Cir. 2021) (recognizing "deference {that} is both greater than and distinct from that

accorded the agency in interpreting the statutes it administers, because it is based on

Commerce's technical expertise"); *Fujitsu*, 88 F.3d at 1039 (same); *Smith-Corona Group v.*

*United States*, 713 F.2d 1568, 1582 (Fed. Cir. 1983) (holding that "review of the statute reveals

tremendous deference to the expertise of {} Commerce in administering the antidumping law");

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed.

Cir. 2000) ("Commerce's special expertise makes it the 'master' of the anti-dumping law,

entitling its decisions to great deference").

Indeed, the statutory scheme reinforces that Congress intended to delegate significant

discretion to Commerce in its implementation of the antidumping duty laws.  For example, in the

URAA, which enacted 19 U.S.C. § 1675(c), Congress expressly approved the SAA, designated

the SAA an "authoritative expression by the United States concerning the interpretation and

application of" the URAA, and authorized Commerce to implement regulations "as may be

necessary" to ensure that the URAA is "appropriately implemented."  *See* 19 U.S.C. §§ 3511-13.

Even though Baux claims that Commerce's regulation is unlawful, Commerce promulgated 19

C.F.R. § 351.412(c)(2) to implement the URAA, and as shown below, did so in a manner

consistent with the statute.  *Preamble*, 62 Fed. Reg. 27,296 at 27,296 & 27,369, 27,370-72 (June

18, 1997).

2.    Commerce's Regulation Is Consistent With The Statute And The SAA

The statute's plain reading and the SAA support Commerce's determination that 19

C.F.R. § 351.412(c)(2) does not contradict, nor conflict with, the requirements of 19 U.S.C.

§ 1677b(a)(7)(A).

Baux argues that Commerce's regulation conflicts with 19 U.S.C. § 1677b(a)(7)(A) under

Step 2 of *Chevron* and is an impermissible reading of the statute by claiming that the statute's

plain language indicates differences in levels of trade are required to be based on differences in

selling activities, and therefore Commerce should be making allowances for "any difference" in

selling activities because those different selling activities are in and of themselves distinct levels

of trade.  Baux Br. at 18 (citing 19 U.S.C. § 1677b(a)(7)(A)).  Specifically, Baux argues that 19

C.F.R. § 351.412(c)(2) conflicts with the plain language of the statute and that Commerce must

initially ask whether there exists a difference in LOT between normal value and EP or CEP

involving the performance of different selling activities.  *Id.* at 15–16.  From there, according to

Baux, the next inquiry is whether these differences affected price comparability such that there is

a pattern of consistent price differences.  *Id.*  Thus, under this analysis, the statute would provide

an LOT adjustment for "any difference" between the normal value and EP or CEP.  *Id.*

However, this reading of the statute is both contrary to its plain terms and Congress' intent as set

forth in the SAA.

The statute does not require Commerce to provide an adjustment when there is "any

difference" in selling activities.  The statute treats levels of trade and selling activities as distinct

concepts, and it does not mandate that Commerce find different levels of trade when any

difference in selling activities is present.  As explained in the IDM, for the statutory provision to

apply, Commerce *must have already found* that the U.S. LOT differs from one or more levels of

trade in the comparison market.  IDM at 9–10.  *Once differences in the LOTs are established*,
Commerce is then authorized to make an adjustment under 19 U.S.C. § 1677b(a)(7)(A) only if
the difference "involves" the performance of different selling activities and is demonstrated to
affect price comparability.  19 U.S.C. § 1677b(a)(7)(A)(i)–(ii).  The statute's use of the word
"involves" indicates that "selling activities" are a distinct concept from the LOT and that
analyzing differences in selling activities alone is *not* necessarily sufficient to establish different
levels of trade.  Therefore, 19 U.S.C. § 1677b(a)(7)(A) instructs Commerce to make allowances
for differences only after Commerce determines that differences in levels of trade exist based on
an analysis of the selling activities alleged by a party.

   The SAA's language supports that having different selling activities does *not*
automatically equal a difference in levels of trade and having some overlap in selling activities
does not automatically mean that the sales were made at the same LOT.   First, the SAA
confirms that levels of trade and selling activities constitute distinct concepts; for example, the
SAA states that "Commerce will require evidence from the foreign producer that the functions
performed by the sellers at the same {LOT} in the U.S. and foreign markets *are similar*," *i.e.* the
selling functions may differ within a given LOT and any difference in selling activities does not
automatically lead to a difference in LOT.   SAA at 829 (emphasis supplied).  The SAA further
supports that "Commerce need not find that the two levels involve no common selling activities
to determine that there are two levels of trade."  SAA at 829.  In other words, the SAA indicates
that two sales with some common selling activities nevertheless may be at different LOTs.  *Id.*
Accordingly, Commerce is required to analyze the evidence provided regarding selling functions
to determine whether the claimed differences in the selling functions are significant enough to

support a finding that, despite some overlap in selling activities, the sales were made at different levels of trade.

Second, the SAA indicates that Congress had particular concern on the validity of a respondent's claims of different selling activities. The SAA's language requires Commerce to conduct an analysis of a respondent's claims: "{b}ecause level of trade adjustments may be susceptible to manipulation, Commerce *will closely scrutinize* claims for such adjustments." *Id.* The SAA also requires that "Commerce {} *carefully investigate* whether {an LOT} adjustment should be made to increase or decrease {normal value}." *Id.* Therefore, the SAA instructs Commerce to "carefully investigate" LOT adjustment claims because Congress was concerned with both artificial and manipulated adjustment claims. Commerce heeded this warning in the *Preamble*:

> If {Commerce} treated every substantial difference in selling activities as a separate level of trade, {Commerce} potentially would be required to address dozens of levels of trade – many of which would be artificial creations. In addition to being extremely burdensome, this would make {Commerce} less likely to find 'patterns of consistent price differences' between the apparently different levels of trade. This would result either in denial of level of trade adjustments altogether or routine use of the {constructed export price} offset. Neither of these results was intended by the {SAA}.

*Preamble*, 62 Fed. Reg. at 27,370–71.

Additionally, the SAA prescribes the burden of proof on the respondent claiming an LOT adjustment to decrease normal value: "if a respondent claims an adjustment to decrease normal value, as with all adjustments which benefit a respondent firm, *the respondent must demonstrate the appropriateness of such adjustment.*" SAA at 829 (emphasis supplied). Therefore, 19 C.F.R. § 351.412(c)(2)'s substantive difference requirement is consistent with Congress' intent because

the regulation incorporates the distinct identities between levels of trade and selling activities detailed in the statutory language and SAA, as well as incorporates the analysis in line with Congress' intent described in the SAA.

Further, although the statute and the SAA recognize levels of trade and selling activities as distinct concepts, 19 U.S.C. § 1677b does not define the term "level of trade"; therefore, the statute is silent as how to determine which sales, or group of sales, constitute an LOT and how to scrutinize the differences in selling activities. Lacking a statutory directive on how to define and interpret whether differences in claimed levels of trade exist, Commerce promulgated 19 C.F.R. § 351.412(c)(2). This regulation instructs Commerce to find that sales are made at a different LOT only when they are made at different marketing stages (or their equivalent), and this analysis requires that such selling activities have substantial differences. *See* 19 C.F.R. § 351.412(c)(2). Commerce's rationale for promulgating 19 C.F.R. § 351.412(c)(2), incorporated in the IDM and the *Preamble* to the regulations, relied on Congress' intent behind 19 U.S.C. § 1677b(a)(7)(A) as elaborated in the SAA. IDM at 10 (citing *Preamble*, 62 Fed. Reg. at 27,370). Even though neither the statute nor the SAA define "level of trade," the SAA illuminates Congress' intent with respect to how Commerce should apply the statute and conduct the LOT analysis. SAA at 656, 829.

Accordingly, Baux's argument that Commerce is required to provide an LOT adjustment for any difference between the claimed levels of trade is contrary to the statutory framework, Congress' intent, and the SAA. It is especially telling that Baux, while claiming Commerce is cherry-picking language from the SAA, fails to address any of the SAA's language that Commerce cites for support, nor is it able to show how Commerce's interpretation is contrary to the SAA's terms. Instead, Baux attempts to cite the language of the SAA and the *Preamble* that

simply summarizes the language of the statutory provision, which directs Commerce how to proceed once Commerce has determined that a difference in levels of trade exists, and Baux ignores the substance of Congress' and Commerce's explanations. Baux Br. at 19–20.

Because the SAA expresses Congress' intent, as the Federal Circuit has recognized, and because Baux has failed to rebut the SAA interpretation of the statute, Baux's claims are without merit. Further, Baux cites several cases for the proposition that Commerce must calculate normal value to achieve a fair comparison with the EP or CEP, and therefore, "the statute should be read broadly to ensure a fair comparison between NV and EP or CEP." Baux Br. at 20–21. However, these cases did not adopt Baux's interpretation of the statute, nor does Baux's refute any of Commerce's interpretations of the statute or the SAA. Moreover, Baux fails to demonstrate how Commerce's regulation would supposedly prevent a "fair comparison."

As demonstrated above, Commerce's regulation is consistent with 19 U.S.C. § 1677b and the will of Congress as elaborated in the SAA. The Court should find that 19 C.F.R. § 351.412(c)(2) is in accordance with law.

### III.    Commerce's Determination To Deny Baux A Level Of Trade Adjustment Is Supported By Substantial Evidence And In Accordance With Law

#### A.    Legal Framework

To compare normal value to the appropriate U.S. price, Commerce is required to establish normal value "to the extent practicable, at the same {level of trade} as" the EP or CEP. *Pakfood Pub.*, 724 F. Supp. 2d at 1338; *see also* 19 U.S.C. § 1677b(a)(1)(B). Normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same {LOT} as the {EP} or {CEP}." 19 U.S.C. § 1677b(a)(1)(B); *see also Micron Tech.*, 243 F.3d at 1304-05.

20

Commerce will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent). 19 C.F.R. § 351.412(c)(2); *Micron Tech.*, 243 F.3d at 1304-05 ("{The Federal Circuit} understand{s} the term to mean comparable marketing stages in the home and United States markets. . . ."); *see also* SAA at 829 (characterizing a "difference in the level of trade" as "a difference between the actual functions performed by the sellers at the different levels of trade in the two markets"). Because different levels of trade may involve different costs, they are considered to affect the comparability of prices; Commerce is authorized to adjust prices to account for any such difference. 19 C.F.R. § 351.412(a).

Commerce will provide an adjustment to account for different levels of trade by increasing or decreasing normal value, "if the difference in the {LOT} (i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade . . . ." 19 U.S.C. § 1677b(a)(7)(A); 19 C.F.R. § 351.412(b). To receive an LOT adjustment, the foreign producer or exporter is required to demonstrate that "the functions performed by the sellers at the same {LOT} in the U.S. and {comparison} markets are similar, and that different selling activities are actually performed at the allegedly different {LOTs}." SAA at 829; *see also Andaman Seafood Co., Ltd. v. United States*, 768 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2011).

The fact that a company sells directly to customers in its home market and sells through an affiliate in the United States does not automatically demonstrate a significant difference in the level of selling activities. *See Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Notice Not To Revoke Antidumping Duty Order in Part*, 75 Fed. Reg. 50,999 (Dep't of Commerce Aug. 18, 2010), and accompanying IDM at Comment 7 (explaining, with reference to the SAA, that a reference to a distributor or wholesaler is

insufficient to establish that "different selling activities are performed at different {levels of trade}").  Instead, Commerce examines the chain of distribution in each market.  *See*, *e.g.*, *Certain Oil Country Tubular Goods from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 Fed. Reg. 54,928 (Dep't of Commerce Oct. 5, 2021), and accompanying PDM at 33, unchanged in *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 20,815 (Dep't of Commerce Apr. 8, 2022), and accompanying IDM; *Strontium Chromate from France: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 66,652 (Dep't of Commerce Nov. 4, 2022), and accompanying PDM at 9, unchanged in *Strontium Chromate from France: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 14,330 (Dep't of Commerce Mar. 8, 2023), and accompanying IDM.  This includes examining selling functions, class of customer (*i.e.*, customer category), and the level of selling activities for each type of sale.  *Id.*

### B.    Commerce's Denial Of A Level Of Trade Adjustment Is Supported By Substantial Evidence

Commerce's decision that the sales of Baux, Bancolor and Madrid DC were made at the same LOT as Baux's U.S. sales is supported by substantial evidence and is in accordance with the law.  Commerce properly denied a level of trade adjustment because Baux failed to demonstrate that it is entitled to an adjustment.  *See* 19 C.F.R. § 351.401(b)(1) ("The interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the {Commerce} the amount and nature of a particular adjustment"); *Koyo Seiko Co.*, 190 F.3d at 1330 ("Although NTN submitted evidence that merchandise at different levels of trade had different prices and selling expenses, NTN did not provide evidence to prove that

those differences were not caused by other factors . . . .  In other words, NTN did not present evidence to establish that the difference in the level of trade caused the differences in price and selling expenses."); *see also Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333, 1337-8 (Fed. Cir. 2016) (*Nan Ya*) ("{T}he burden of creating an adequate record lies with interested parties and not with Commerce.").  In addition, this Court has sustained similar determinations by Commerce despite the existence of minor differences between the U.S. and home markets. *See Sucocitirico Cutrale Ltda. v. United States*, 36 CIT 821, 827–28 (2012) ("Although Commerce noted minor differences between the two markets, these differences do {sic} rise to the level required by the statute. . . .  Commerce's factual determination that there is not a substantial difference in the {levels of trade} in the two markets is reasonable and supported by substantial evidence.").

     As explained in the IDM, Commerce substantial evidence supports Commerce's level of trade determination.  Commerce obtained information from Baux regarding the marketing stages involved in making its reported home market sales, including a description of the selling activities performed for each channel of distribution and quantitative support.  IDM at 12–13 (citing Section A Response at 17-25 and Exhibits A-4, A-5, and A-6, Supplemental Section A Response at 7-10 and Exhibits A-19 (Revised) and SA-3, and Supplemental Section A-C Questionnaire Response Part II – Questions 1-7 & 10-15 at 4-12).  In the *Preliminary Results* PDM, Commerce found that Baux failed to provide the supporting documentation necessary to warrant an LOT adjustment.

     In its questionnaire responses, Baux reported six channels of distribution in the home market, claiming three levels of trade: (1) sales made directly from Baux to unaffiliated customers (LOT 1); (2) downstream sales of Baux's aluminum sheets, which Baux's affiliate

Bancolor sold to unaffiliated customers (LOT 2); and (3) downstream sales of Baux's aluminum sheets with Bancolor's Madrid DC resold to unaffiliated customers (LOT 3). IDM at 13 (citing Baux Supplemental Section A Response at Exhibit A-19 (Revised)). Within these channels, Baux categorized its selling functions by intensity level and assigned numeric values to them, ranked on a scale of zero to ten but did not provide support for these rankings. *Id*. When asked to support these rankings with source documentation and linkages to its accounting system, it was unable to do so. *Id*. at 13–14 (citing PDM at 10).

Commerce provided Baux with additional opportunities to supplement evidence of their selling activities as part of their requested LOT adjustment, including two supplemental questionnaires requesting qualitative and quantitative evidence demonstrating their reported intensity levels and the "appropriateness" of finding the existence of multiple levels of trade. *Id*. (citing Supplemental Section A Questionnaire at 7-10 and Baux Supplemental Section A-C Questionnaire Response Part II – Questions 1-7 & 10-15 at 4–12); *see also* SAA at 829 ("{T}he respondent must demonstrate the *appropriateness* of such adjustment." (emphasis added)). Specifically, Commerce requested that Baux submit information, including a list of the specific activities for each selling activity category, sufficient supporting documentation to substantiate each activity during the POR, and sufficient qualitative record evidence to show how each reported activity is relevant to the LOT analysis. *Id*. at 13 (citing PDM at 10). In its third response, Baux submitted a chart listing its selling functions and some supporting documentation. *Id*.

Ultimately, however, Commerce found that the record evidence did not support Baux's intensity designations for its selling functions to warrant an LOT adjustment. *Id*. Specifically, Baux's first response was inadequate because it "failed to describe the specific activities it

performed for each selling function or to provide supporting documentation that clearly

substantiated its reported intensity levels{.}" IDM at 13 (citing PDM at 10). Subsequent

responses from Baux were equally unavailing because "Baux did not explain how the new

documentation supported its reported data, nor did it provide documentation for all of the selling

activities it reported." *Id*. (citing PDM at 10).

After reviewing the record in light of the parties' arguments, for the final results,

Commerce continued to find no level of trade adjustment was warranted. In its administrative

case brief, to support its intensity designations, Baux only cited a single selling activity–

collection of payment; however, Baux identifies no record evidence showing that it actually

performed different activities with respect to this function. *Id.* at 14 (citing Baux Admin Br. at

43). Instead, Baux cites an exhibit in its original questionnaire response showing that Baux

required payment within a set number of days, Bancolor had a number of "possible" payment

terms, and Madrid DC had various "different" payment terms. *Id.* (citing Baux Admin Br. at

43).

As Commerce explains in its IDM, Baux's evidence "largely ends there, with Baux

making no effort to tie these terms to its home market sales database or to show how these

payment term differences translated into actual actions taken by its administrative staff." *Id.* at

14. Instead, Baux rests its arguments on speculation, stating that "these payment terms were not

only more in number, but they also involved forms of payment that reasonably could entail

additional processing effort to receive" and, therefore, Baux had "amply supported" its intensity

levels. *Id.* Without record evidence for support, Commerce cannot simply infer that higher

frequencies automatically result in higher intensities. Because Baux's argument rests on

speculation, rather than substantial evidence, Commerce found that Baux did not meet its burden

of proof.  *Id.* at 14.  As Commerce notes, "Baux fails to show how acceptance of payment under this term would involve much (or indeed any) effort on the part of those affiliates; instead, it simply states that 'additional processing efforts . . . would reasonably be expected to process these' straightforward payments."  IDM at 14 n.53 (citing Baux Admin Br. at 44).

Baux also argued in its administrative briefing that its LOT claims are self-evident given that its sales by Bancolor or Bancolor's Madrid DC are more remote from the factory.  *Id.* at 14. Baux specifically relied on the *Preamble*'s language stating, "{it} is sufficient that, at the more remote level, the seller takes on a role comparable to that of a reseller if the merchandise had changed hands twice," and "{e}ach more remote level must be characterized by an additional layer of selling activities, amounting in the aggregate to a substantially different selling function."  Baux Admin Br. at 39 (citing *Preamble*, 62 Fed. Reg. at 27,371).  As required by 19 C.F.R. § 351.412(c)(2), Commerce must find substantial differences in selling activities before determining that there is a difference in the stage of marketing.  19 C.F.R. § 351.412(c)(2). Similarly, as recognized by Commerce, the *Preamble* provides that remote sales from the factory *must* involve an additional layer of selling activities and requires that those activities *must* collectively amount to a *substantially* different selling function.  IDM at 15.  Nowhere in the *Preamble* does Commerce say that this analysis is unnecessary in the circumstances envisioned by Baux, and Commerce's practice is to undertake the level of trade analysis as a matter of course.  *Id.* at 15 (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16,363 (Dep't of Commerce April 4, 2017), and accompanying IDM at Comment 4).

Further, the cited passage from the *Preamble* does not relate to Baux's situation. Although Baux describes the customers of Bancolor's Madrid DC differently from its own

customers, the Madrid DC's customers are not necessarily more remote from the factory.  *Id.*

Commerce explained its rationale by observing that Baux did not explain what constitutes a

"distribution center customer", and "to the extent that some of these customers are end users,

they may be equally remote from the factory as Baux's direct customers."  *Id.* at 15 n.58 (citing

Baux Admin Br. at 37).

As in the administrative proceeding, Baux contends that Commerce's determination that

only one LOT existed in the home market is not supported by substantial evidence and in

accordance with law because the record contains sufficient evidence to find multiple home

market levels of trade.  Baux Br. at 11, 21–44.  Specifically, Baux argues that Commerce failed

to provide a reasonable explanation for treating this case differently from other similar LOT

determinations or ignored record evidence that detracted from the determination that only one

level of trade existed in Baux's home market.  *Id.*  For support, Baux argues that (1) different

home channels of distribution existed as Bancolor and Madrid DC served as resellers, (2)

Bancolor and Madrid DC performed different selling functions such as warehousing, small

customer service, and commissions, and (3) plaintiffs performed differing intensity levels for

overlapping selling functions.  *Id.*  Commerce considered whether those differences in selling

activities could amount to "substantial differences" to warrant a finding of the existence of levels

of trade and support a level of trade adjustment and found that they did not, as explained in the

IDM.  *See* IDM at 8–19; 19 C.F.R. § 351.412(c)(2); 19 U.S.C. § 1677b(a)(7)(A).

1.  Commerce's Determination With Respect To Baux's Affiliates' More-Remote
    Sales Is Supported By Substantial Evidence

Baux's first core argument is that Commerce should have found a different level of trade

based on evidence showing different channels of distribution, such as direct-factory sales

compared to sales by a reseller using inventory in a distribution center.  Baux Br. at 22–24.

Specifically, Baux contends that it sold subject merchandise at a more remote level and its affiliates took on a role comparable to a reseller after the product changed hands, and that Commerce had previously found different levels of trade upon the same distinction. *Id*. at 22–24 (citing *Certain Fabricated Structural Steel from Mexico: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,390 (Dep't of Commerce Jan. 30, 2020) (*Structural Steel from Mexico*), and accompanying IDM at Comment 8, *CRS from the UK*, 81 Fed. Reg. 49,929, and accompanying IDM at 8–10, and *SS Bar from Brazil*, 79 Fed. Reg. 75,789, and accompanying IDM at 8).

As explained in the IDM, however, Baux misstates the standard that Commerce uses to determine whether home market channels of distribution constitute one or more levels of trade. IDM at 14–15. Whether merchandise "change{s} hands twice, going from producer to reseller/distributor to downstream customer," is not the dispositive factor that Commerce considers in its LOT analysis. *Id.* As explained above, 19 C.F.R. § 351.412(c)(2) requires Commerce to determine whether sales are made at different marketing stages, and this regulation specifies that Commerce must find substantial differences in selling activities before determining that there is a difference in the stage of marketing. The *Preamble* supports this proposition, providing that (1) sales that are more removed from the factory must involve an additional layer of selling activities, and (2) those activities must collectively amount to a substantially different selling function. *Preamble*, 62 Fed. Reg. at 27,371. Contrary to Baux's attempt to side-step the analysis, the *Preamble* does not allow Commerce to forego this analysis in certain circumstances. *See id.* ( "{a}lthough the type of customer will be an important indicator in identifying differences in LOTs, the existence of different classes of customers is not sufficient to establish a difference in the {LOTs}.").

Baux cites *Structural Steel from Mexico*, *CRS from the UK*, and *SS Bar from Brazil* for support. Commerce explained why Baux's reliance on these administrative cases is misplaced. IDM at 15. In each case, Commerce analyzed the selling activities performed in the claimed channels of distribution and found that the differences in those activities were substantial and that in no case did Commerce simply accept the reported channels of distribution. *See Structural Steel from Mexico* IDM at Comment 8 (detailing the significant differences in selling activities, stating that "{t}he quantity of functions performed by Corey in the {home market} is significantly greater than the quantity of functions performed by BSM for its U.S. sales."); *CRS from the UK* IDM at Comment 1 (finding "significant differences between Channel 1 sales and Channel 2 sales with respect to market research, inventory maintenance, procurement services, and engineering/R&D/product development services," such that they represented different marketing stages); *SS Bar from Brazil* PDM at 8 (finding "significant differences between the selling activities associated with the CEP {LOT} and those associated with the home market {levels of trade}").

Further, Baux did not explain what constitutes a "distribution center customer." IDM at 15 n.58. And to the extent that some of these customers are end users, they may be equally remote from the factory as Baux's direct customers. *Id.* (citing Baux's Admin. Br. at 37). Commerce performed the same analysis as it did in Baux's cited proceedings and reasonably concluded that the selling functions do not support a finding of a distinct level of marketing. *Id.* at 15.

Additionally, analyzing selling activities is a highly fact intensive, case-by-case exercise, and although the consistency of Commerce's analysis is pertinent, each proceeding stands on its own record. *See Hyundai Steel Co. v. United States*, 279 F.Supp. 3d, 1349, 1370–71 (Fed. Cir.

2017) ("The selling functions in those cases could well have differed from the functions {respondent} performed here, and thus Commerce could reasonably have come to a different conclusion about the applicability of a CEP offset in those cases based on the particular facts."); *see also Peer Bearing Co. v. United States*, 587 F. Supp. 2d 1319, 1325 (Ct. Int'l Trade 2008) (citing *Shandong Huarong Mach. Co. v. United States*, No. 03-00676, (Ct. Int'l Trade 2005)). Therefore, Baux's assertion that its affiliates' supposedly conducting sales at a more-remote level from the factory is sufficient to establish the existence of different levels of trade is incorrect.

2.    Commerce's Determination With Respect To Baux's Selling Functions Is Supported By Substantial Evidence

Baux next argues that its affiliates, Bancolor and Madrid DC, performed several home market selling functions–warehousing, small customer support, and commissions–that Baux did not perform during the POR.  Baux Br. at 25–39.

Baux cites *Pasta Zara I* to argue that a difference in selling function is sufficient to establish the existence of different levels of trade and that sales by Bancolor and Madrid DC are at a more remote level than Baux.  *Id.* at 22–27, 37–38 (citations omitted).  *Pasta Zara I*, however, does not support Baux's position.  In *Pasta Zara I*, the Court found that Commerce did not conduct an analysis as to whether the separate selling function claimed by the exporter sufficed to establish a "meaningful" LOT and remanded for Commerce to "conduct an analysis of whether Pasta Zara SpA performed a separate selling function in making the sales to the traditional local customers."  *Pasta Zara I*, 703 F. Supp. 2d at 1327, 1329–30.  In this case, however, Commerce performed that analysis and found that the selling activities did not satisfy the regulatory requirements for them to be considered sales made at a separate LOT.  IDM at 12. Indeed, in *Pasta Zara II*, the Court sustained Commerce's remand redetermination that there was

30

a single LOT in the home market because Commerce found "key findings that indicate a lack of a separate selling function{, including that} Zara did not perform the storage, handling, and loading of products for the traditional local customers at a separate location or with separate staff." *Pasta Zara II*, 781 F. Supp. 2d at 1303 ("{S}elling activities must be substantially different for a separate LOT to occur, but '{s}ome overlap in selling activities will not preclude a determination that two sales are at different stages of marketing.'").

With respect to the specific selling functions of further processing, warehousing and commissions, Baux fails to explain why Commerce is required to adjust for these functions despite already being accounted for them in other normal value adjustments or how Commerce failed to consider record evidence that fairly detracted from its conclusion. Baux argues that its affiliates performed warehousing services in the home market that Baux did not. Baux Br. at 27–32. Baux explained that Bancolor further processed CAAS before selling, and that Madrid DC re-coiled, slit, cut, powder-coated, and panel sandwiched before selling, and that Baux did not. *Id.* However, Commerce has explained that some of the expenses that Baux identified (for example, further processing, warehousing, commissions, *et cetera*) were not pertinent to Baux's LOT analysis because "Commerce may only consider the expenses associated with those activities to the extent that they differ from those reported elsewhere in a company's response and are already accounted for in Commerce's dumping analysis." IDM at 16. The SAA makes clear that an LOT adjustment cannot also adjust for expenses already captured. SAA at 829 ("Commerce . . . will ensure that expenses previously deducted from {normal value} are not deducted a second time through {an LOT} adjustment. . . ."). Commerce has already adjusted Baux's home market prices for warehousing expenses, which Baux has admitted. IDM at 16 n.

70 (citing Baux Section B-C Response at 36 (C.R. 14–34) and Verification Report at Exhibit 15);
*see* Baux Br. at 31–32.

Baux also argues that Madrid DC performed commissions that no other LOT in Baux's
home market had.  Baux Br. at 37–39.  Baux states that Madrid DC used an [

].  *Id.* at 38
(citations omitted).  However, like for warehousing services, the SAA stipulates that Commerce
cannot adjust for expenses already captured when making an LOT adjustment.  *See* SAA at 829.
As explained in the IDM, Commerce adjusted Baux's marketing prices for commissions, which
Baux has admitted.  IDM at 16; Baux Br. at 38.  Although Baux asserts that Commerce's
"methodological decision" to adjust Madrid DC's commission sales distort price comparability,
Baux fails to cite any record evidence to support this statement.  Baux Br. at 38–39.  Further,
Baux has not challenged this adjustment in its complaint.  *See generally* Complaint, ECF 10.
Therefore, Commerce properly declined to make a level of trade adjustment based on
commissions, because expenses relating to commissions were already captured in the dumping
calculations.  IDM at 16; *see also* Final Results Analysis Memorandum for Compania Valencia
de Aluminio Baux, S.L.U./Bancolor Baux, S.L.U. (P.R. 135) (C.R. 153) at Attachment 1 (C.R.
154) at line 9476 and Attachment 2 (C.R. 157) at pdf 55, rows 33-39, showing that commission
expenses were accounted for in the home market.

Lastly, for further processing for small customers, the "unique activities" that Baux
claims Commerce ignored have already been accounted for through reporting in the "VCOMH"
field and used as part of the "DIFMER" adjustment.  IDM at 16.  Baux does not refute the fact
that Commerce has already accounted for the warehousing, commissions, or further processing,
but instead claims that Commerce failed to consider detracting evidence.  Baux Br. at 27, 37, 38

(citing *Changzou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020)).  However, Commerce considered these claims and reasonably found that it is unable to consider the expenses at issue as part of an LOT adjustment because the SAA plainly states "that expenses previously deducted from {normal value} are not deducted a second time through {an LOT} adjustment."  IDM at 16 (citing SAA at 829).

Baux also contends that small customer services provided by Bancolor and Madrid DC constitute significant differences in selling activities, but Commerce reasonably found that Baux failed to demonstrate that it undertook substantial selling activities related to this purported function.  *Id.* at 17.  As explained above, despite Commerce's multiple requests, Baux failed to provide a narrative explaining exactly what the selling activity of small customer service entailed and how it differed from the broader category of "customer support."  *Id.*  Baux explains that "{g}iven that the Madrid DC had a significant number of small orders, and these orders represented a diverse product, the Madrid DC by necessity had to expend significantly more customer support to meet these orders."  Baux Br. at 36 (citing Baux Admin. Br. at 38).  Commerce disagreed, explaining that Baux's conclusion that Madrid DC "*by necessity* had to undertake significantly more customers support" was not supported by record evidence that would indicate the customer support provided was *actually* different between the claimed levels of trade, as required by the statute and SAA.  IDM at 17 (emphasis in original); *see also* SAA at 829 ("Commerce will require evidence from the foreign producer that the functions performed by the sellers at the same {LOT} in the U.S. and foreign markets *are similar*, and that different selling activities are actually performed at the allegedly different {levels of trade}." (emphasis added)).  Even in its brief before the Court, despite devoting numerous pages to rehash the discussion on small customer services, Baux rests its argument on *speculation* that "Madrid DC

*must* be offering different services given that its customers are smaller than Baux's customers."
Baux Br. at 35 (emphasis added).    Speculation is not sufficient for finding different levels of
trade.

    With respect to Baux's record evidence of sales of individual sheets to support its small
customer service argument, which it argues is representative of additional and different selling
activities, Commerce did not dispute that Baux made such sales or that they entailed different
inventory requirements as a result.  However, Commerce explained that Baux had not made clear
why this selling activity (and associated expenses) would not be captured and accounted for
under the Madrid DC's warehousing functions, a point that Baux failed to explain in its
underlying administrative brief.  IDM at 17 n.77.  Baux's evidence of sales of individual sheets
does not advance Baux's claim because that evidence fails to prove *actual* differences in selling
activities.  Moreover, even if Commerce were to find small customer support constitutes a selling
function, as Baux wishes, Baux still failed to demonstrate that this selling function alone would
warrant different home market levels of trade.  *Id.* at 17 n.78.  Therefore, Baux has failed to
support its claim, and Commerce reasonably found that the record evidence does not indicate
that differences in prices between these customer categories is attributable only to differences in
levels of trade.  *Id.* (citing *ESBR from Brazil* IDM at 9).

    In essence, Baux's arguments amount to a disagreement with Commerce's weighing of
the record evidence.  This is not a valid basis to overturn Commerce's reasoned determination.
*See*, *e.g.*, *Timken Co.*, 699 F. Supp. at 306 ("not within the Court's domain either to weigh the
adequate quality or quantity of the evidence."); *Goldlink Indus. Co*, 431 F. Supp. 2d at 1326
(accord); *cf. INS*, 502 U.S. at 483–84 (when Congress has entrusted agency to administer statute
in fact-intensive situations, agency's conclusion should be reversed only if the record evidence is

"so compelling that no reasonable factfinder" could reach the same conclusion). The Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar*, 744 F.2d at 1562. Commerce's determination that sales from Bancolor and Madrid DC do not justify different levels of trade is reasonable and supported by substantial evidence on the record.

3.    Commerce's Determination Regarding Baux's Levels of Intensity Designations Is Not Contrary To *Universal Tube* and Commerce Did Not "Verify" Baux's Reported LOT Claims

Baux claims also that its intensity designations are valid under its replication of the quantitative analysis that Commerce found sufficient under *Universal Tube*, and that it is sufficient to show that Baux performed various selling functions, albeit at different intensity designations, common to all levels of trade. Baux Br. at 39–44 (*Universal Tube & Plastic Indus. v. United States*, 586 F. Supp. 3d 1312 (Ct. Int'l Trade 2022)). Baux contends that Commerce improperly concluded that Baux had failed to provide supporting documentation of the different selling functions' reported intensity levels because "it is unnecessary to further examine selling functions performed at all levels but at different intensities" when there are differences in selling activities. *Id.* at 39–40. However, respondents have the burden of establishing their eligibility for an LOT adjustment by demonstrating that different prices and selling expenses are caused by differences in levels of trade and not by other factors. *See, e.g.*, *Koyo Seiko Co.*, 190 F.3d at 1330 ("Although NTN submitted evidence that merchandise at different {levels of trade} had different prices and selling expenses, NTN did not provide evidence to prove that those differences were not caused by other factors. . . . In other words, NTN did not present evidence to establish that the difference in the level of trade caused the differences in price and selling expenses."), *see also* SAA at 829.

35

Baux's reliance on *Universal Tube* is also inapposite.  IDM at 18–19.  As Commerce explained, Universal's quantitative analysis is inapposite from Baux's in key areas.  *Id.* Specifically, in a remand following the Court's opinion in *Universal,* Commerce found that Universal made home market sales at two levels of trade, based on Commerce's demonstration that the intensity of the selling functions and the expenses that resulted from those differences were significantly different.  *Id.* at 18 (citing *Universal Final Remand*).  Specifically, Universal provided certain quantitative metrics for its two channels of distribution, along with the indirect selling expenses incurred in those channels.  *Id*.  Universal also compared the net prices of the same product (that is, control numbers or CONNUMs) sold through each distinct channel of distribution to further support its qualitative claims.  *Id.*

Although Baux tried to replicate this analysis, Baux failed to provide sufficient qualitative record evidence or the equivalent level of quantitative record evidence as Universal. *Id.*  As Commerce explained, in contrast to Universal's breakdowns and calculations, Baux merely took an average of the prices in each of the three claimed levels of trade to show that prices differed across the claimed levels of trade.  *Id.* at 18 n.85 (citing Baux Supplemental Section A-C Questionnaire Response Part II – Questions 1-7 & 10-15 at 11).  However, Baux failed (1) to show that the different average prices among the three claimed levels of trade were not attributable to differences in the product mix of each entity, or (2) to show those differences correlated with differences in the selling activities at the three claimed levels of trade.  *Id.*  In other words, Baux has simply shown that prices vary by seller without identifying the reason behind these differences as required by 19 U.S.C. § 1677b and the SAA.  *Id*.  As established above, the burden of proof for seeking an adjustment lies with the respondent.  *See Koyo Seiko Co.*, 190 F.3d at 1330; *see also Nan Ya*, 810 F.3d at 1337–38.

Further, Baux states throughout its brief that Commerce verified information supporting its home market LOT claims.  Baux Br. at 8, 21, 29, 33.  This is incorrect.  Commerce explained that "{c}ompany officials {had} explained the previously reported channels of distribution and associated selling functions in the home and U.S. market," and that Commerce examined Baux's claimed level of trade – home (LOTH)/level of trade – U.S. (LOTU) and found no discrepancies in the LOTH/LOTU designations that Baux reported.  IDM at 18 (citing Verification Report at 6, 12).  However, because Commerce had provided Baux multiple opportunities to provide evidence to support its claimed levels of trade and Baux had failed to do so, at no time did Commerce verify Baux's claim for the adjustment or allow Baux additional opportunities to supplement its claims with new factual information during the verification.  *Id.*  Commerce adequately explained that it had not in fact verified Baux's claim for the level of trade adjustment, and Baux's attempts to frame Commerce's verification as having done so are incorrect.

In sum, Commerce properly determined that Baux's home market sales constitute one level of trade because Baux did not satisfy its burden of proof to demonstrate its claim that multiple levels of trade existed.  Although Commerce attempted several times to corroborate Baux's claims, Baux could not provide information adequately demonstrating the existence of different levels of trade in the home market.  IDM at 13–14 (citing PDM at 11).

## **CONCLUSION**

For these reasons, we request respectfully the Court to deny plaintiffs' motion for judgement on the agency record.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                    /s/Kyle S. Beckrich
CHRISTOPHER KIMURA                             KYLE S. BECKRICH
Attorney                                       Trial Attorney
Office of the Chief Counsel                    U.S. Dept. of Justice
    for Trade Enforcement and Compliance    Civil Division
U.S. Department of Commerce                     Commercial Litigation Branch
Washington, D.C.                                P.O. Box 480
                                               Ben Franklin Station
                                               Washington, D.C. 20044
                                               Telephone: (202) 616-9322
                                               E-mail: kyle.beckrich@usdoj.gov

September 9, 2024                              *Attorneys for Defendant*

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 11,223 words, including text, footnotes, and headings.

<u>/s/Kyle S. Beckrich</u>
Kyle S. Beckrich