## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| COMPANIA VALENCIANA DE ALUMINIO BAUX, S.L.U. and BANCOLOR BAUX, S.L.U., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, <br><br> Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Ct. No. 23-00259** <br> **Nonconfidential Version** |

### REPLY BRIEF OF PLAINTIFFS COMPAÑIA VALENCIANA DE ALUMINIO BAUX, S.L.U. AND BANCOLOR BAUX S.L.U.

Jeffrey S. Grimson
Kristin H. Mowry
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

November 27, 2024

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES........................................................................................ ii

ARGUMENT ............................................................................................................ 1

I.   THE GOVERNMENT FAILS TO SUPPORT THAT COMMERCE'S REGULATORY TEST FOR DETERMINING DIFFERENCES IN LEVELS OF TRADE COMPORTS WITH THE STATUTE .................. 1

   A.   This Court Need Not Defer to Commerce When Determining the Best Interpretation of the Statute........................................................................................................ 2

   B.   The Best Interpretation of the 19 U.S.C. § 1677b(a)(7)(A) is That the Performance of Different Selling Activities Establishes the Existence of Different LOTs ............................ 6

II.   THE GOVERNMENT FAILED TO ESTABLISH THAT BAUX WAS NOT STATUTORILY ENTITLED TO A LOT ADJUSTMENT .........................................................................................11

   A.   Baux Submitted Substantial Evidence Establishing That It Performed Different Selling Activities in the Home Market........................................................................... 12

   B. Baux Submitted Substantial Evidence Demonstrating that Its Different Selling Activities Affected Price Comparability in the Home Market ............................................ 17

CONCLUSION........................................................................................................ 21

## TABLE OF AUTHORITIES

**Cases**

Bennett v. Spear,
   520 U.S. 154 (1997)..................................................................................................... 8

Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,
   5 F.4th 1367 (Fed. Cir. 2021)................................................................................... 4, 5

Chevron U.S.A., Inc. v. NRDC,
   467 U.S. 837 (1984)..................................................................................................... 2

F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,
   216 F.3d 1027 (Fed. Cir. 2000)................................................................................. 4, 6

Fujitsu Gen. v. United States,
   88 F.3d 1034 (Fed. Cir. 1996)................................................................................... 4, 6

Huayin Foreign Trade Corp. v. United States,
   322 F.3d 1369 (Fed. Cir. 2003).................................................................................. 12

Loper Bright Enterprises v. Raimondo,
   144 S. Ct. 2244 (2024).......................................................................................... passim

Marbury v. Madison,
   5 U.S. 137 (1803)......................................................................................................... 4

NSK Ltd. v. Koyo Seiko Co.,
   190 F.3d 1321 (Fed. Cir. 1999).................................................................................. 19

Pasta Zara SpA v. United States,
   34 CIT 355 (2010) ...................................................................................................... 13

Pasta Zara SpA v. United States,
   35 CIT 620 (2011)....................................................................................................... 13

Qingdao Taifa Group Co. v. United States,
   __ CIT __, 637 F. Supp. 2d 1231 (2009) ................................................................... 17

Qingdao Taifa Group Co. v. United States,
  467 Fed. Appx. 887 (Fed. Cir. 2012) ................................................................ 17

RHP Bearings v. United States,
  288 F.3d 1334 (Fed. Cir. 2002)......................................................................... 21

Skidmore v. Swift & Co.,
  323 U. S. 134 (1944).......................................................................................... 4

Smith-Corona Group v. United States,
  713 F.2d 1568 (Fed. Cir. 1983) ...................................................................... 4, 6

Sucocitrico Cutrale Ltda. v. United States,
  36 CIT 821 (2012) .............................................................................................11

Universal Tube & Plastic Indus. v. United States,
  __ CIT__, 586 F. Supp. 3d 1312 (2022)……………………………………………19

Ventura Coastal, LLC v. United States,
  No. 23-00009, slip op. 24-125 (Ct. Int'l Trade Nov. 7, 2024) ........................ 4, 5, 7

**Statutes**

19 U.S.C. § 1677b.................................................................................... passim

**Other Authorities**

Certain Cold-Rolled Steel Flat Products Final Determination of Sales at Less Than Fair Value, 81
  Fed. Reg. 49,929 (Dep't of Commerce July 20, 2016)........................................ 14

Common Alloy Aluminum Sheet from Spain: Final Results of Antidumping Duty Administrative
  Review; 2020-2022, 88 Fed. Reg. 76,722 (Nov. 7, 2023) .................................... 7

Merriam Webster, Involve, https://www.merriam-webster.com/dictionary/involve...................... 9

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316
  (1994)................................................................................................ 9, 10, 15

**Regulations**

19 C.F.R. § 351.412 .................................................................................................. passim

Plaintiffs Compañia Valenciana de Aluminio Baux, S.L.U. ("Baux") and Bancolor Baux S.L.U. ("Bancolor") reply to the response brief of Defendant the United States (the "Government"). <u>See</u> Def.'s Resp. in Opp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. (Sept. 9, 2024) (Nonconfidential Version), ECF No. 35 ("Gov.'s Br."); <u>see also</u> Def.-Intervenors' Resp. in Opp. to Pls.' Mot. for J. on the Agency R. (Oct. 9, 2024), ECF No. 36 (incorporating the Government's arguments).[1]

**ARGUMENT**

**I.    THE GOVERNMENT FAILS TO SUPPORT THAT COMMERCE'S REGULATORY TEST FOR DETERMINING DIFFERENCES IN LEVELS OF TRADE COMPORTS WITH THE STATUTE**

The level of trade ("LOT") test implemented by the U.S. Department of Commerce ("Commerce") under 19 C.F.R. § 351.412(c)(2) is not in accordance with law and resulted in Commerce making an unfair comparison between Baux's export price ("EP") and normal value ("NV") at different LOTs.  Commerce's statutory mandate prescribes that it "shall" make a LOT adjustment where there is a "<u>difference</u> in {LOT} between the {EP} . . . and {NV}" where the difference is based on the "performance of <u>different</u> selling activities" and those different selling activities are "demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at {LOTs} in the country in which {NV} is determined."  19 U.S.C. § 1677b(a)(7)(A)(i)-(ii) (emphasis added).  Commerce's implementing regulation, however, inserts an intensity requirement that "<u>substantial</u> differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing."  19 C.F.R. § 351.412(c)(2) (emphasis added).  Since Baux filed its opening brief, <u>Chevron</u> deference has been overturned by the Supreme Court in <u>Loper Bright Enterprises v. Raimondo</u>, 144 S. Ct. 2244 (2024).

---

[1] All citations are to the parties' nonconfidential briefs unless otherwise noted.

1

This Court should find, consistent with Loper, that Commerce's regulatory test to find a qualifying difference in LOTs is not in accordance with law because the best interpretation of 19 U.S.C. § 1677b(a)(7)(A) is that Congress intended for any difference, as opposed to substantial differences, in selling activities to necessitate a LOT adjustment.

## A. This Court Need Not Defer to Commerce When Determining the Best Interpretation of the Statute

In its opening brief, Baux argued that Commerce's regulatory test to determine the existence of different LOTs was not in accordance with law under Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43 (1984).  See Rule 56.2 Mot. for J. on the Agency R. of Pls.' Baux and Bancolor at 16-21, ECF No. 30 ("Baux 56.2 Br.").  Under Chevron, if a statute is ambiguous, a court must determine whether the agency's implementation of the statute and implementing regulation is permissible.  See 467 U.S. at 843-44.  A court can only uphold Commerce's interpretations that are reasonable.  See id. at 844.  Baux acknowledged that the statute does not expressly define LOT.   See Baux 56.2 Br. at 16; see also 19 U.S.C. § 1677b(a)(7)(A)(i). Nonetheless, Commerce's regulatory test was unreasonable under Chevron Step 2 because 19 C.F.R. § 351.412(c)(2) inserted a level of intensity requirement that was not present in 19 U.S.C. 1677b(a)(7)(A)(i).  See Baux 56.2 Br. at 16-21.

Although Commerce's implementing regulation is not in accordance with law under Chevron Step 2, this Court need not defer to the reasonability of Commerce's interpretation of the statute and its implementing regulation.  As the Government recognizes, since Baux filed its opening brief, the Supreme Court overturned Chevron deference in Loper.  See Gov.'s Resp. Br. at 14; see also Baux 56.2 Br. at 13, n.2.  In overruling Chevron, the Supreme Court held that:

> Chevron is overruled. Courts must exercise <u>their independent judgment</u> in deciding whether an agency has acted within its statutory authority, as the APA requires . . . . {C}ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

<u>Loper</u>, 144 S. Ct. at 2273 (emphasis added).  The Supreme Court explained that an ambiguity in the statute does not "necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question." <u>Id.</u> at 2265.  Further, the Supreme Court held that courts as opposed to agencies are in the best position to resolve an ambiguity in a statute:

> Perhaps most fundamentally, <u>Chevron's</u> presumption is misguided because agencies have no special competence in resolving statutory ambiguities. Courts do. The Framers, as noted, anticipated that courts would often confront statutory ambiguities and expected that courts would resolve them by exercising independent legal judgment. .  .  . The very point of the traditional tools of statutory construction—the tools courts use every day—is to resolve statutory ambiguities.

<u>Loper</u>, 144 S. Ct. at 2266 (internal citations omitted).  Post <u>Loper</u>, in resolving an ambiguity in the statute, a court is to apply "all relevant interpretative tools" to reach the "best" interpretation of the statute.  <u>Id.</u>  In other words, where there is an ambiguity in a statute, a court no longer needs to sustain an agency's interpretation so long as it is reasonable and must instead determine the best interpretation of the statute.  <u>See id.</u>  Here, the best interpretation of the statute is that Congress intended that <u>any</u> difference in selling activities, as opposed to <u>substantial</u> difference in selling activities, is sufficient to establish a difference in LOTs.  <u>Compare</u> 19 U.S.C. 1677b(a)(7)(A)(i), <u>with</u> 19 C.F.R. § 351.412(c)(2).  Commerce's regulatory test inserting an intensity requirement to determine a qualifying difference in LOTs is not in accordance with law because it conflicts with the plain language of 19 U.S.C. § 1677b(a)(7)(A).

Although the Government acknowledges that <u>Loper</u> overruled <u>Chevron</u> Step 2, its arguments that <u>Loper</u> "did not disturb the Federal Circuit's longstanding recognition that Commerce's determinations in antidumping and countervailing duty matters are entitled to

deference <u>distinct</u> from <u>Chevron</u>, due to their complex and technical nature" ignores the clear holding in <u>Loper</u> that courts can properly interpret statutes that cover technical matters. Gov.'s Br. at 15 (citing <u>Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.</u>, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021); <u>F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027, 1032 (Fed. Cir. 2000); <u>Fujitsu Gen. v. United States</u>, 88 F.3d 1034, 1039 (Fed. Cir. 1996); <u>Smith-Corona Group v. United States</u>, 713 F.2d 1568, 1582 (Fed. Cir. 1983)). In <u>Loper</u>, in dismissing the dissent's argument that judges may not be "experts in the field," the Supreme Court explained that matters of "legal interpretation . . . has been, 'emphatically,' 'the province and duty of the judicial department' for at least 221 years." 144 S. Ct. at 2273 (quoting <u>Marbury v. Madison</u>, 5 U.S. 137 (1803)). In particular, concerning technical matters, the Supreme Court explained that "even when an ambiguity happens to implicate a technical matter, it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts and given it to the agency. Congress expects courts to handle technical statutory questions." <u>Loper</u>, 144 S. Ct. at 2267. Although the Supreme Court recognized that an agency's interpretation of a statute may be informative, it nevertheless held that such interpretation "cannot bind a court." <u>Id.</u> (citation omitted); <u>see also</u> <u>Skidmore v. Swift & Co.</u>, 323 U. S. 134, 140, (1944) (holding that an Executive Branch's interpretation has "power to persuade, if lacking power to control"). In interpreting the impact of <u>Loper</u> in trade matters, the court recently recognized that "{c}ourts exercise their independent judgment in deciding statutory meaning." <u>See</u> <u>Ventura Coastal, LLC v. United States</u>, No. 23-00009, slip op. 24-125 at 23 (Ct. Int'l Trade Nov. 7, 2024) (citing <u>Loper</u>, 144 S. Ct. at 2262). The court explained that "although {<u>Loper</u>} acknowledges that agencies may be empowered to make 'fact bound determinations,' an agency's power to apply the law to particular facts does not undermine the Court's duty to address questions of statutory meaning." <u>Ventura</u>, slip op. 24-125

at 24 (quoting Loper, 144 S. Ct. at 2259).  This Court, therefore, may consider Commerce's interpretation of 19 U.S.C. § 1677b(a)(7)(A) but ultimately must make its own legal determination in reaching the "best" interpretation of the statute.

The pre-Loper Federal Circuit cases relied on by the Government do not stand for the proposition that Commerce's statutory interpretations are "entitled to deference distinct from Chevron" such that Commerce is still owed substantial deference post-Loper.  Gov.'s Br. at 15. The court recently dismissed the Government's same argument in Ventura, noting that "although Defendant correctly notes that precedent that predates Chevron have given great weight to Commerce's determinations of a technical nature . . . {Loper} explains that courts will give weight to those determinations only to the extent that the reasoning underlying them has the power to persuade."  Slip op. 24-125 at 24, n. 17 (citing Loper, 144 S. Ct. at 2267).  Indeed, in Borusan, as relied on by the Government, the Federal Circuit explained that under the "substantial evidence standard" a court gives "tremendous deference to Commerce's administration of {antidumping} laws" because this level of deference is based on "Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing  statute, as opposed to interpreting the meaning of the statue itself where ambiguous." 5 F.4th at 1374-75 (citation and quotations omitted) (emphasis added).  Further, the Federal Circuit noted that "substantial evidence" is "'distinct from that accorded the agency in interpreting the statutes it administers.'"  Id. (citation omitted).  The Federal Circuit's holding in Borusan, thus, does not concern a court's authority to interpret a statute but instead provides that Commerce's factual determinations are owed a high level of deference separate from the now-overturned Chevron deference.  Similarly, the Federal Circuit's holdings in F. Lli De Cecco and Fujitsu concern the greater level of deference afforded to Commerce in making factual determinations as opposed to

statutory interpretations.  See F. Lli De Cecco, 216 F.3d at 1032 (noting that "Commerce's special expertise makes it the 'master' of the antidumping law" and therefore "factual determinations supporting antidumping margins are best left to the agency's expertise." (citation omitted) (emphasis added)); Fujitsu, 88 F.3d at 1039.  Finally, in Smith-Corona, the Federal Circuit did not apply a level of deference separate from Chevron but instead found that Commerce's acted "within the framework of the statute and {Commerce's implementing} regulations" when it made certain adjustments to the NV and, accordingly, Commerce's implementing regulation was "reasonable." 713 F.2d at 1582-83.  The Federal Circuit in effect applied Chevron Step 2 deference in Smith-Corona and that deference has now been overruled in Loper.  The Federal Circuit cases relied on by the Government, thus, do not mandate that this Court give greater deference to Commerce's statutory interpretations in trade matters distinct from Chevron deference that was overturned by Loper.

Although Baux still maintains that Commerce's regulatory test to determine the existence of different LOTs under 19 C.F.R. § 351.412(c)(2) is an unreasonable interpretation of 19 U.S.C. § 1677b(a)(7)(A) under Chevron Step 2, the Supreme Court overturned this level of deference in Loper.  This Court must now apply principles of statutory interpretation to reach the "best" interpretation of 19 U.S.C. § 1677b(a)(7)(A).

### B. The Best Interpretation of the 19 U.S.C. § 1677b(a)(7)(A) is That the Performance of Different Selling Activities Establishes the Existence of Different LOTs

The "best" interpretation of 19 U.S.C. § 1677b(a)(7)(A) is that Congress intended for any difference in selling activities to be sufficient to establish a difference in LOTs and, thus, Commerce's test under 19 C.F.R. § 351.412(c)(2) requiring that a respondent demonstrate a substantial difference in selling activities is not in accordance with law.  This interpretation is

consistent with the plain language of the statute, gives full effect to the entire statute and is consistent with the underlying purpose of a LOT adjustment to establish a fair comparison between EP and NV.  See Baux 56.2 Br. at 16-21.  The Government's arguments that 19 C.F.R. § 351.412(c)(2) does not conflict with the requirements of 19 U.S.C. § 1677b(a)(7)(A) are unpersuasive.  See Gov.'s Br. at 16-20.

Although 19 U.S.C. § 1677b(a)(7)(A) does not expressly define a LOT, the Government is wrong that statute lacks a "directive on how to define and interpret whether differences in claimed levels of trade exist."  Gov.'s Br. at 19.  In Ventura, the court explained that "{g}eneral rulemaking authority does not empower an agency to give meaning to the law" as such a power would "render{} Loper . . . meaningless."  Ventura, slip op. 24-125 at 25.  The court further noted in Ventura that an agency may have some flexibility to give meaning to the words of a statute if Congress includes open-ended phrases in the statute such as "reasonable" or "appropriate."  Id. at 23 (citing Loper, 144 S. Ct. at 2263).  Here, 19 U.S.C. § 1677b(a)(7)(A) contains no such flexibility to allow Commerce to define a LOT separately from the statute.  To the contrary, the statute mandates that Commerce "shall" make a LOT adjustment "to make due allowance for any difference (or lack thereof between the {EP}. . . and {NV}."  19 U.S.C. § 1677b(a)(7)(A) (emphasis added).  The plain language of the statute does not require that Commerce make a LOT adjustment when there are "substantial" differences but instead "any" differences.  Further, the plain language of statute, as Commerce itself recognized, refers to the "performance of different selling activities" as opposed to the requirement in 19 C.F.R. § 351.412(c) that "substantial differences in selling activities" are a necessary condition for the existence of different LOTs.  See Common Alloy Aluminum Sheet from Spain: Final Results of Antidumping Duty Administrative Review; 2020-2022, 88 Fed. Reg. 76,722 (Nov. 7, 2023) ("Final Results") (P.R. 140), and accompanying Issues

and Dec. Mem. at 9 ("Final I&D Mem.") (P.R. 134). The references in the statute to "any" or "different" selling activities demonstrate that Congress intended to define distinct LOTs based on the existence of any different selling activities as opposed to substantial selling activities.

The Government also wrongly echoes Commerce's conclusion that 19 U.S.C. § 1677b(a)(7)(A) only applies where Commerce has already found "that the U.S. LOT differs from one or more levels of trade in the comparison market." Gov.'s Br. at 16-17 (citing Final I&D Mem. at 9-10 (P.R. 134)). The Government's argument creates a circular test that renders the statute ineffectual in certain circumstances. A "'cardinal principle of statutory construction'" is that a Court must "'to give effect, if possible, to every clause and word of a statute' . . . rather than to emasculate an entire section." Bennett v. Spear, 520 U.S. 154, 173 (1997) (internal citations omitted). The Government's interpretation of 19 U.S.C. § 1677b(a)(7)(A) can lead to an unreasonable scenario where a difference in LOT may not exist under Commerce's unlawful test (if there are not substantial difference in selling differences) but Commerce is nevertheless statutorily required to make a LOT adjustment because there are differences between EP and NV resulting from the performance of different selling activities. See 19 U.S.C. § 1677b(7)(A)(i). The "best" interpretation of the 19 U.S.C. § 1677b(a)(7)(A), therefore, is that Congress intended that any difference in selling activities establishes the existence of different LOTs. Otherwise, under the Government's preferred interpretation, the requirement that Commerce must make a LOT adjustment whenever there is any difference between EP and NV based on the performance of different selling activities that affect price comparability is rendered superfluous.

Nor should the Court be convinced by the Government's assertion that that "the statute's use of the word 'involves' indicates that 'selling activities' are a distinct concept from LOT." Gov.'s Br. at 17 (quoting 19 U.S.C. § 1677b(a)(7)(A)). Merriam Webster defines "involve" as "to

have within or as part of itself" or "to require as a necessary accompaniment."  Merriam Webster, Involve, https://www.merriam-webster.com/dictionary/involve (last visited Nov. 27, 2024).   The Government's argument is nonsensical given that the 19 U.S.C. § 1677b(a)(7)(A) mandates that Commerce "shall" make a LOT adjustment where the "difference in {LOT} between the {EP} . . . and {NV}, if the difference in LOT — <u>involves</u> the performance of different selling activities . . . ." 19 U.S.C. § 1677b(a)(7)(A)(i) (emphasis added).  The "performance of different selling activities" is not a distinct concept from LOT but instead a "part of" or "necessary accompaniment" of determining when Commerce is statutorily required to make a LOT adjustment.

Further, the Government, much like Commerce, cherry picks language from the Statement of Administrative Action ("SAA") to support its preferred interpretation of the statute.  <u>See</u> Gov.'s Br. at 17-20; <u>see also</u> Final I&D Mem. at 10-12 (P.R. 134).  The SAA instructs that "Commerce will require evidence from the foreign producers that the functions performed by the sellers at the same {LOT} in the U.S. and foreign markets are similar, and that <u>different</u> selling activities are actually performed at the allegedly different levels of trade."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, at 829 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4167-68 (emphasis added).  The Government conveniently only quotes the first clause of these instructions and ignores the second clause where the SAA expressly instructs that Commerce need only examine whether "different" selling activities are performed at the different LOTs.  <u>See</u> Gov.'s Br. at 17.  Indeed, the SAA later clarifies that "different levels of trade {are established} based on the performance of <u>different</u> selling activities."  SAA at 830 (emphasis added).  The Government also wrongly claims that the SAA's instruction that "Commerce need not find that the two levels involve no common selling activities to determine that there are two {Lots}" demonstrates that Commerce is required to examine the significance of those selling

activities.  See Gov.'s Br. at 17 (quoting SAA at 829).  The "best" reading of this statement, when read in context with the entire SAA, is that that Commerce may find that two LOTs exist even if both LOTs have similar selling functions so long as they also have __different__ selling functions.  The SAA supports that the "best" interpretation of 19 U.S.C. § 1677b(a)(7)(A) is that __different__ selling functions are sufficient to establish the existence of distinct LOTs.

Nor is the Government correct that Commerce heeded Congress' warning in the SAA that a LOT adjustment could be subject to manipulation by inserting an intensity requirement in the regulation.  See Gov.'s Br. at 18-19.  The Government's argument overlooks that the underlying purpose of the statute is to ensure "a fair comparison" between NV and EP.  19 U.S.C. § 1677b.  Commerce's tightening of its regulatory test to establish a difference in LOTs treads upon this purpose because it may result, as it did with respect to Baux, in an unfair comparison between EP and NV.

Congress' statutory adjustment is outcome neutral in that it may raise __or__ lower NV to account for price differences due to different LOTs.  Commerce's narrowing of the adjustment to only scenarios where there are "substantial" differences rather than making the adjustment where there are any differences may mask dumping in situations where the LOT adjustment would raise NV and inflate margins.  If the facts of a case justified an adverse LOT adjustment for a respondent, then Commerce's pre-programmed LOT SAS programming macro would make that adjustment.  Commerce's clear posture in tightening eligibility for the LOT adjustment indicates that Commerce presumes that an LOT adjustment would only benefit a respondent leading to a mindset to deny adjustments when at all possible.  This illustrates how unreasonable Commerce's application of the statutory LOT adjustment has become, all stemming from its unlawful narrowing of the adjustment intended by Congress.

10

Finally, the court's holding in <u>Sucocitrico Cutrale Ltda. v. United States</u>, 36 CIT 821 (2012) does not support the legality of Commerce's regulatory test. <u>See</u> Gov.'s Br. at 23 (citing <u>Sucocitrico</u>, 36 CIT at 827-828). This Court should not find the holding in <u>Sucocitrico</u> to be persuasive given that the Court in that case did not examine the legality of Commerce's regulatory test. <u>See</u> <u>Sucocitrico</u>, 36 CIT at 827-28. Rather, the court found that "Commerce's regulations, when read in conjunction with the statute" require a substantial difference in selling activities prior to making a constructed export price adjustment. <u>Id.</u> at 827. In reaching its conclusion, the court relied on the very regulatory provision that Baux challenges in this appeal. <u>See id.</u> at 828. Further, the Plaintiffs' arguments in <u>Sucocitrico</u> that Commerce reacted unlawfully relied on 19 U.S.C. § 1677b(a)(7)(B) whereas here Baux relies on 19 U.S.C. § 1677b(a)(7)(A) when challenging the legality of Commerce's regulatory test. <u>See id.</u> at 827. Finally, <u>Sucocitrico</u> was decided pre-<u>Loper</u>, and now the Court much reach the "best" interpretation of the statute. The court's holding in <u>Sucocitrico</u>, thus, does not represent either binding or persuasive authority that Commerce's regulatory test is lawful.

For these reasons, Commerce's regulatory test for determining the existence of different LOTs under 19 C.F.R. § 351.412(c)(2) is not in accordance with law because it inserts a level of intensity requirement that is not present in 19 U.S.C. § 1677b(a)(7)(A). The "best" interpretation of 19 U.S.C. § 1677b(a)(7)(A) is that Congress intended for <u>any</u> difference in selling activities to be sufficient to establish the existence of different LOTs.

## II.    THE GOVERNMENT FAILED TO ESTABLISH THAT BAUX WAS NOT STATUTORILY ENTITLED TO A LOT ADJUSTMENT

Once the proper test is applied, whereby any difference in selling activities is sufficient to demonstrate the existence of distinct LOTs, the only reasonable reading of the record is that LOT adjustment was necessary because: 1) Baux and its affiliates performed different selling functions

with respect to its sales used to calculate EP and NV and 2) these differences in selling activities affected the price comparability of Baux's and its affiliates' sales.  See Baux 56.2 Br. at 21-44; see also Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (holding that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citation and quotation omitted) (emphasis added)).

### A. Baux Submitted Substantial Evidence Establishing That It Performed Different Selling Activities in the Home Market

The only reasonable reading of the record was that Baux's home market consisted of three distinct LOTs: (1) factory direct sales from Baux to unaffiliated customers (LOT 1), (2) downstream sales that Baux's affiliate Bancolor processed and sold to unaffiliated customers (LOT 2), and (3) warehouse sales by Bancolor's Madrid DC to unaffiliated customers (LOT 3).  Baux met its burden of proof to demonstrate that it performed different selling activities in the three identified LOTs in the home market by submitting substantial evidence on the record, including information that Commerce verified,[2] showing that Baux and its affiliates performed certain selling functions, as opposed to just mere selling activities, in some LOTs but not others in the home market.  See id.

Commerce's determination that Baux only made sales at one LOT in the home market was not supported by substantial evidence or otherwise in accordance with the law because the only reasonable reading of the record was that Baux performed different selling functions in certain

---

[2] The Government's assertion that Commerce did not "verify Baux's claim for the adjustment" does not accurately reflect the record.  Gov.'s Br. at 37.  Baux concurs that the Government took no additional information that Baux prepared for verification, see Baux's 56.2 Br. at 8, fn. 8, despite Commerce's verification agenda including an item for Baux to "{d}iscuss and provide support for the reported selling activities."  See Letter from Emily Halle to Jeffrey S. Grimson: Verification Outline (Jun. 15, 2023) (P.R. 112).  Commerce nonetheless verified this information with respect to other portions of its verification agenda.  See Baux 56.2 Br. at 8-10 (Confidential Version), ECF No. 29.

identified LOTs but not others in the home market.  See Baux's 56 Br. at 25-39.  The court has previously held that "demonstrating adequately a different selling function, as opposed to demonstrating merely a difference in selling activities, would be 'sufficient'" to establish a difference in LOTs.  Pasta Zara SpA v. United States, 34 CIT 355 (2010) ("Pasta Zara I")).  A difference in selling activities, therefore, inarguably exists where a selling function is performed in one channel of distribution but not another.  This is the case even if Commerce's additional limiter of "substantial" differences is used since it is obvious that a function performed at one level but not another is not a matter of degree, but rather akin to a binary yes/no difference.  The Government argues that Pasta Zara I is distinguishable from the agency proceeding underlying this appeal because, unlike in Pasta Zara I, here, Commerce examined whether Baux performed a separate selling function and found that Baux's selling activities did not meet Commerce's regulatory requirements for a finding of different LOTs.  See Gov.'s Br. at 30.  Again, Commerce's regulatory requirements are not in accordance with law. [3]  Regardless of the illegality of Commerce's regulatory test, this Court should find the holding in Pasta Zara I to be persuasive given that it is consistent with Commerce's own past determination where Commerce found that the performance of a selling function in one sales channel but not others is sufficient to meet Commerce's regulatory requirements to grant a LOT adjustment.  In Commerce's antidumping duty investigation of certain cold-rolled steel flat products from the United Kingdom, Commerce rejected an argument from one of the petitioners that the selling activities occurring in two different

---

[3] The Government's claim that this appeal is also distinguishable from the administrative proceeding underlying the Pasta Zara I case where Commerce found on remand that there was a single LOT in the home market because the record "indicat{ed} a lack of separate selling function" is equally without merit.  Gov.'s Br. at 30-31 (citing Pasta Zara SpA v. United States, 35 CIT 620 (2011).  Here, as discussed below, the Government does not challenge that Baux performed separate selling functions in different channels of distribution in the home market.

sales channels were slight because a "selling function {was} performed at one channel but is not performed at all at the other channel."   Certain Cold-Rolled Steel Flat Products Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 49,929 (Dep't of Commerce July 20, 2016), and accompanying I&D Mem. at 8.   Court precedent and Commerce's past practice confirms that the performance of a selling function in one channel of sales and not another warrants a finding of distinct LOTs even under Commerce's unlawful regulatory test requiring substantial differences in selling activities.

Baux clearly established on the record that it performed warehousing services, small customer support and commissions in certain identified LOTs in the home market but not others. See Baux 56.2 Br. at 27-39.   Indeed, the Government does not rebut Baux's argument that the record established that it performed warehousing services and commissions in certain identified LOTs in the home market but not others.   See Gov.'s Br. at 31-32.   By definition, a selling function is performed at an infinitely greater intensity when it occurs in one channel of trade in the home market but not another.   Despite accepting that Baux performed certain warehousing services and commissions in some identified LOTs but not others in the home market, the Government nevertheless maintains that granting Baux a LOT adjustment was not warranted because Commerce had already adjusted Baux's home market prices for warehousing expenses and commissions.   See id. at 31-32 (citing Final I&D Mem. at 16 (P.R. 134)).   Contrary to the Government's contention, Commerce expressly declined to adjust Baux's home market prices for external warehousing expenses, instead, requiring Baux to revise its reporting of these expenses to be captured within Baux's cost reporting even though these external warehousing expenses incurred for processing services performed by external vendors were directly related to individual sales and had direct impact on the physical characteristics of, and thus the value of the merchandise

14

reflected in those sales. See Letter on Behalf of Baux to Commerce re: Supp. Sec. B-C Resp. at

11 (Mar. 10, 2023) (Public Version) ("Supp. Sec. B-C Resp.") (P.R. 73) ("As instructed, Baux has

set the external warehouse processing expenses 'WHSERV1H' from its HM sales database equal

to zero and instead has reported those costs in its revised Bancolor cost database"). As Baux

argued in its administrative case brief:

> Commerce's requirement to move a portion of the warehousing expenses out of the
> sales database to the cost database also highlights the need for the LOT adjustment,
> as this is a perfect example of activities occurring at a more advanced marketing
> level (the Madrid DC) that may have price effects but where associated expenses
> would not be accounted for by any otherwise-reported fields deducted in
> Commerce's margin program. Commerce's program accounts for LOT price
> comparability differences after first accounting for directly-reported price
> adjustments and therefore would never consider expenses associated with differing
> levels of trade that are subsumed within the company's cost as Commerce directed
> Baux to do. But by refusing to admit the existence of any LOT differences,
> Commerce prevented its own program from making a fair comparison and
> accounting for any and all such LOT price effects not already reflected by sales
> adjustments

Letter on Behalf of Baux to Commerce re: Case Brief at 31 (Aug. 15, 2023) (Public Version)

("Baux Case Br.") (P.R. 120-122). The SAA is clear that a LOT adjustment is designed to isolate

price effects so as to "ensure that expenses previously deducted from {NV} are not deducted a

second time through a {LOT} adjustment." SAA at 830. Here, Commerce ensured that Baux's

expenses would not be double-counted through a LOT adjustment by removing relevant

adjustments from Baux's reported direct selling expenses altogether. Not only has Baux

demonstrated differences in the selling functions performed through each LOT but Commerce's

mandate to treat reported selling expenses as costs ensured that the performance of these different

selling activities were not deducted from NV through Commerce's margin programming.

Unlike warehousing and commissions, the Government does argue that Baux failed to

demonstrate how small customer support differed from its overall customer support. See Gov.'s

Br. at 33 (citing Final I&D Mem. at 17 (P.R. 134)).  Baux provided that it "operates a distribution center located in Madrid" and that distribution center, i.e., Madrid DC, "maintains sales inventory in its on-site warehouse . . . to serve{} a large number of smaller-volume customers."  Letter on Behalf of Baux to Commerce re: Sec. D Resp. at D-6 (Aug. 23, 2022) (Public Version) (P.R. 45-47).  Baux supported this statement by submitting invoices demonstrating that Madrid DC made sales to a distinct customer base that purchased smaller quantities of CAAS than Baux's primary factory direct sales of full coils of aluminum sheet to industrial customers.  See Baux 56.2 Br. at 24; see also id. at 35 (explaining that certain invoices included in Baux's verification exhibits also demonstrate that DC Madrid made sales on individual sheets that Baux did not sell to its customers).  Contrary to the Government's arguments, Baux's assertation that the Madrid DC by necessity had to perform significantly more customer support because it had a significant number of small orders representing diverse products is not based on speculation.  See Gov.'s Br. at 33; see also Final I&D Mem. at 17 (P.R. 134).  Where the record demonstrates that Baux's factory direct sales were not made to small customers, Baux cannot have performed small customer support as compared to Madrid DC.  It was unreasonable for Commerce to find that Baux should have provided additional evidence of a function that it did not perform given that no such evidence could have existed.

For these reasons, Commerce's finding that Baux failed to demonstrate that it performed substantially different selling functions at the three different LOTs that it identified in the home market was not supported by substantial evidence or otherwise not in accordance with law.  The Government does not rebut that Baux or its affiliates performed warehousing services and commissions in certain LOTs in the home market but not others.  The only reasonable reading of the record is that a selling function performed in one of the LOTs but not others is necessarily performed at a greater intensity, indeed, an infinitely different intensity.  Commerce's warehousing

services were not adequately captured by Commerce's price adjustments and a LOT adjustment was instead necessary to ensure an adequate comparison between EP and NV.  Further, even presuming the legality of Commerce's regulatory test, Baux demonstrated that it performed payment terms at various degrees of intensities in all three identified LOTs in the home market.

**B.  Baux Submitted Substantial Evidence Demonstrating that Its Different Selling Activities Affected Price Comparability in the Home Market**

In addition to establishing that it performed different selling activities in the three identified LOTs in its home market, Baux also submitted substantial evidence demonstrating that these differences affected price comparability based on a pattern of consistent price differences between sales at different LOTs in the home market.  See Baux's 56.2 Br. at 43-44.  The Government's claim that "Baux failed (1) to show that the different average prices among the three claimed levels of trade were not attributable to differences in the product mix of each entity, or (2) to show those differences correlated with differences in the selling activities at the three claimed levels of trade" is incorrect on both counts.  See Gov.'s Br. at 36.

Concerning the Government's first claim, Commerce moved the goal post in finding that Baux did not demonstrate that different average prices among the three claimed LOTs were not attributable to differences in the product mix of each entity.  The Court has found that a party "may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because . . . the party would not have had a full and fair opportunity to raise the issue at the administrative level." Qingdao Taifa Group Co. v. United States, __ CIT __, __, 637 F. Supp. 2d 1231, 1236 (2009), aff'd without opinion, 467 Fed. Appx. 887 (Fed. Cir. 2012).  Commerce never asked Baux to demonstrate that different prices in the home market were not attributable to differences in the product mix of each entity, either in its initial questionnaire (which only asks a respondent to fill a matrix of selling functions and intensity levels) or in

17

Commerce's supplemental questions specific to LOT.  See Letter from Commerce to Baux re: Initial Questionnaire at A-7 to A-8, A-15 (June 17, 2022) (Public Document) ("Initial Questionnaire") (P.R. 16-17); Letter from Commerce to Baux re: Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from Spain: Supplemental Questionnaire at 5-6 (March 23, 2023) (Public Version) (P.R. 77).  In the preliminary results, Commerce only explained that it sought information on price comparability from Baux but provided no analysis on the information submitted by Baux.  See Mem. from James Maeder to Lisa W. Wang re: Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from Spain; 2020-2022 at 8-12 (Public Document) (P.R. 97).  It was not until the Final Results, and buried in a footnote in its decision memorandum, that Commerce first found that Baux's analysis on price comparability was flawed because it didn't show that the price differences were not attributable to differences in the product mix of each entity.  See Final I&D Mem. at 18, n.85 (P.R. 134).  Baux did not have an opportunity to challenge Commerce's finding until this appeal and this fact alone warrants a remand for Commerce to consider Baux's arguments in the first instance.

Baux clarifies that the record clearly shows that differences in average prices among the three claimed LOTs are not attributable to differences in product mix.  Almost all merchandise sold through LOT 3, i.e. by Madrid DC, is not produced by Madrid DC because it does not have the capability to cast, roll, paint, or perform any number of other manufacturing operations performed by Baux and Bancolor.  See, e.g., Letter on Behalf of Baux to Commerce re: Sec. B Resp. at B-5 to B-6 (Aug. 22, 2022) (Public Version) (P.R. 40-42) (detailing the production activities of Baux, Bancolor and Madrid DC).  Instead, Madrid DC engaged primarily in sales of merchandise that was manufactured by either Baux or Bancolor and primarily sold by those

entities.  Sales through LOT 3, therefore, exhibit different prices even for identical merchandise sold through a different LOT but produced by the same entity.  For instance, CONNUM [                    ] was sold by Baux at a gross unit price of [        ] EUR/KG in HM observations [                    ] but was sold by the Madrid DC for as much as [        ] EUR/KG in HM observation [            ] and during the POI for as much as [        ] EUR/KG in HM observation [        ].  See Letter on Behalf of Baux to Commerce re: Submission of Revised Databases at Ex. 1 (Sept. 14, 2023) (Business Proprietary Document) (C.R. 150-152) ("Sec. B Database"); see also Attachment 1 (including excerpts of Baux's Section B database for the Court's convenience given that the databases are submitted on the record in SAS format).  These observations represent sales of merchandise of an identical CONNUM, both produced by Baux and sold in the same month yet for [            ] different prices.  Similarly, Bancolor sold CONNUM [                ] for [        ] EUR/KG in observation [        ] while the identical CONNUM was sold by the Madrid DC the following month for [        ] EUR/KG in HM observations [                ].  See id.  The difference in price between these sales of identical products by different entities, therefore, cannot be due to product mix.

Turning to the Government's second claim, contrary to the Federal Circuit's holding in NSK Ltd. v. Koyo Seiko Co., 190 F.3d 1321 (Fed. Cir. 1999), as relied on by the Government, Baux submitted evidence "to establish that the difference in the level of trade caused the differences in price and selling expenses."  Id. at 1330.  As Baux explained in its opening brief, it replicated the quantitative analysis that Commerce previously found to be sufficient to establish distinct LOTs.  See Baux 56.2 Br. at 41-42 (discussing Baux's replication of the quantitative analysis submitted by a respondent in the remand proceeding following Universal Tube & Plastic Indus. v. United States, __ CIT__, 586 F. Supp. 3d 1312 (2022)).  In its case brief before

Commerce, Baux created a chart of the average gross price in each of the three LOTs that it identified in the home market compared to the corresponding selling expense ratios. See Baux Case Br. at 50 (C.R. 146-148). This chart shows that [


]. See id. The Government quibbles with the fact that, unlike in Universal, Baux compares gross prices as opposed to net prices. See Gov.'s Br. at 36. According to the statute, however, it is irrelevant whether a respondent relies on gross versus net prices, so long as the respondent demonstrates "a pattern of consistent price differences between sales at different {LOTS} in {the home market}." 19 U.S.C. § 1677b(7)(A)(ii). Nor does Commerce's questionnaire instruct the respondent that LOTs will only be considered where a respondent shows price differences at the different levels on a net basis. See Initial Questionnaire at A-7 to A-8, A-15 (P.R. 16-17). While this is how the respondent in the Universal case analyzed price differences successfully following the court remand, it asks too much for respondents to discern Commerce's hidden rules only from court remand proceedings rather than by clear instructions in an initial or supplemental questionnaire. Commerce cannot lawfully impose this requirement for the first time in the Final Results after the factual record is closed.

If Commerce is right that its program adjusts for all expense and costs differences to arrive at net price – Commerce's desired comparison basis – then the SAS macro LOT program would simply return no price adjustment where price differences are related to those same adjustments as Commerce fears. In other words, if the price differences are solely the result of sales expense adjustments, then Commerce's program would deduct for 100 percent of the price differences in the normal course – no more, no less. On the other hand, if there are price differences that are not being accounted for after making all required adjustments to net price, then Commerce's program

would result in a LOT adjustment, which is what the statute intends.  The LOT macro itself determines if a price adjustment is necessary, on a results-neutral basis, if only Commerce had flipped the switch to let it run.  Commerce undoubtedly did so here in its internal analyses and understands the significant impact on the final antidumping margin.  To state the obvious, Baux would not be litigating this issue if it made no difference in the final antidumping margin.

For these reasons, Commerce's finding that Baux only demonstrated that "prices vary by seller without identifying the reason behind these differences" is not supported by substantial evidence and otherwise not in accordance with law.  Final I&D Mem. at 18 (P.R. 134).  Commerce provided "insufficient reasons," treating the facts in this appeal differently than its remand redetermination in Universal Tube given that Baux submitted substantial quantitative evidence to demonstrate that the different selling activities performed in the home market affected price comparability.  RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002).

## CONCLUSION

This Court should grant Plaintiffs' motion for judgment on the agency record and remand Commerce's Final Results for redetermination to find that three LOTs existed in the home market and, accordingly, make a LOT adjustment to ensure an accurate comparison between EP and NV sales made at different LOTs.

                                    Respectfully submitted,

Dated: November 27, 2024            /s/ Jeffrey S. Grimson
                                    Jeffrey S. Grimson
                                    Kristin H. Mowry
                                    Bryan P. Cenko
                                    *Counsel to Compañia Valenciana de*
                                    *Aluminio Baux, S.L.U. and Bancolor Baux*
                                    *S.L.U.*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and the Scheduling Order to this case.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,950 words.

Dated: November 27, 2024

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Compañia Valenciana de Aluminio Baux, S.L.U. and Bancolor Baux S.L.U.*

# Attachment 1

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

**Attachment Not
Susceptible to Public
Summary**